JAMES R. ADLER *et al.*, Plaintiffs-Appellants, v. WILLIAM BLAIR AND COMPANY *et al.*, Defendants-Appellees.

First District (4th Division)    No. 1—91—3366

Opinion filed March 9, 1995.—Rehearing denied March 30, 1995.

Holstein, Mack & Klein, of Chicago (Jewel N. Klein, David L. Poindexter, Aron D. Robinson, and C. Corey S. Berman, of counsel), for appellants.

Timothy A. Nelsen, Christina M. Tchen, and Donna L. McDevitt, all of Skadden, Arps, Slate, Meagher & Flom, of Chicago, for appellees.

SUPPLEMENTAL OPINION UPON REMAND[1]

JUSTICE THEIS delivered the opinion of the court:

The plaintiffs in this action are two putative classes and several individuals who invested in a real estate syndication known as William Blair Realty Services Partners III (Partners III), a limited partnership. Following the loss of their investments, the plaintiffs filed an amended complaint alleging common law and statutory fraud, breach of fiduciary duty and misrepresentation against the defendants, William Blair & Company, Plumwood Corporation and William Blair Realty Services Limited. The defendants moved to dismiss the complaint for failure to state a cause of action and on the

---

[1]On March 31, 1993, in a published opinion, this court affirmed the decision of the trial court to dismiss the complaint for failure to state a cause of action. (*Adler v. William Blair & Co.* (1993), 245 Ill. App. 3d 57, 613 N.E.2d 1264.) The plaintiffs subsequently filed a petition for leave to appeal the matter to the Illinois Supreme Court. The supreme court allowed the petition and then remanded the matter to this court for further consideration in light of its decision in *Siegel v. Levy Organization Development Co.* (1992), 153 Ill. 2d 534, 607 N.E.2d 194, filed a few months before this court's decision. Therefore, *Adler v. William Blair & Co.* (1993), 245 Ill. App. 3d 57, 613 N.E.2d 1264, has been republished here. Significant changes appear only in the portion of the opinion discussing the Consumer Fraud and Deceptive Business Practices Act. This opinion supersedes our earlier decision.

grounds that certain of the claims were barred by the applicable limitations period. (Ill. Rev. Stat. 1989, ch. 110, pars. 2—615, 2—619, respectively.) The trial court dismissed the plaintiffs' complaint with prejudice and denied leave to amend.

The issues on appeal are whether the plaintiffs' complaint stated a cause of action for fraud, misrepresentation and breach of fiduciary duty and whether the trial court abused its discretion in denying leave to amend.

A brief explanation of how the parties relate to one another is necessary to an understanding of the issues. The defendant William Blair & Company (Blair) is a general partnership engaged in the securities brokerage business. One of the partners of Blair, Judson C. Ball, was also the president of the defendant Plumwood Corporation (Plumwood). Blair and Plumwood created William Blair Realty Services (WBRS), a limited partnership, for the purpose of creating real estate syndications. Plumwood was the general partner of WBRS and Blair was a limited partner. Under the operating procedures of WBRS, Blair was to "sponsor" all real estate syndications offered by WBRS, and Plumwood was to create and sell the syndications subject to the approval of the WBRS advisory committee. The advisory committee consisted of several individuals who were officers of or held management positions in Blair.

One of the syndications created by WBRS was a limited partnership known as William Blair Realty Services Partners III (Partners III). The private placement memorandum (PPM) given to persons interested in investing in Partners III identified WBRS as the general partner of Partners III. It identified Plumwood as the general partner of WBRS and Blair as the limited partner of WBRS. Blair was not identified as either a general or limited partner of Partners III. However, Blair did act as a selling agent for the Partners III offering.

Limited partnership interests in Partners III were sold as a nonpublic, unregistered offering of securities. Such offerings are exempt from the registration requirements of the securities laws provided they are made only to sophisticated investors. In the case of Partners III, the offering was limited to accredited investors as defined under Federal securities laws and to no more than 35 nonaccredited investors who met certain minimum investment eligibility requirements. To meet the eligibility requirements, a nonaccredited investor had to certify that he had a net worth of at least $250,000, that an investment in Partners III would represent no more than 20% of his joint net worth, that he had sufficient knowledge and experience in business and financial matters to evaluate the risks of an investment in

Partners III and that he could withstand the loss of the entire investment. The minimum investment in Partners III was $50,000.

Prior to making an investment in Partners III, prospective investors were given a lengthy private placement memorandum (PPM). Several provisions of the PPM are significant to the issues on appeal, making it necessary to describe the document in some detail. The inside cover page contains a statement in bold print that "**THIS OFFERING INVOLVES A HIGH DEGREE OF RISK.**" The PPM identifies WBRS as the general partner and states that WBRS would answer all inquiries as to the proposed operation of Partners III, the experience of the general partner and any other matters relating to the offering. It further stated:

> "The General Partner will afford prospective investors and offeree representatives the opportunity to obtain any additional information *** necessary to verify the accuracy of any information set forth in this Memorandum or the attached Exhibits."

The PPM states that Partners III was organized for the purpose of "locating, acquiring, developing, leasing, operating and selling commercial real estate." The principal investment objectives are described as follows:

> "1. [P]reserve and protect the Partnership's capital;
>
> 2. [A]chieve long-term capital gains;
>
> 3. [O]btain partially 'tax-sheltered' distributions of cash from operations; and
>
> 4. [G]enerate reasonable Partnership tax losses from straight-line real estate depreciation to offset or 'shelter' a Unit holder's taxable income from other sources."

The investors are warned in bold print that "**THERE CAN BE NO ASSURANCE THAT THESE OBJECTIVES WILL BE ATTAINED.**" The PPM also states that Partners III was not structured primarily to produce tax benefits for the investors and that WBRS estimates that investors would receive only modest tax losses resulting from the partnership operation. Several pages of the PPM are devoted to a discussion of the tax consequences of an investment in Partners III, and investors are "strongly urged to consult their tax advisors with specific reference to their own tax situation" before investing. Also, the PPM specifically cautions prospective investors that Congress was considering tax law changes which, if adopted, could significantly reduce or eliminate the tax benefits of an investment in Partners III.

The PPM discloses that, as general partner of Partners III, WBRS would have sole authority and responsibility for the management and control of the partnership's operations. Significantly, the PPM

explicitly states that "[t]he General Partner is required to make a contribution of $100 to the capital of the Partnership." The general partner is not personally liable for the return of all or any portion of the capital or profits of any partner. It stated that any such return of capital or profits would be made solely out of the assets of Partners III.

In a section entitled "Conflicts of Interest," the PPM states that Partners III is subject to various conflicts of interest arising out of its relationship with WBRS. Among the conflicts described is the receipt by WBRS of certain benefits and fees, including property management fees arising out of the acquisition of property by Partners III. The PPM further states that "[b]ecause [Partners III] was organized and will be operated by the General Partner, these conflicts will not be resolved through arm's-length negotiations, but through the exercise of the General Partner's judgment."

Before purchasing an interest in Partners III, prospective investors were required to submit a signed and notarized subscription agreement, representing among other things that:

"1. I have received and read the [PPM] and am hereby applying for the purchase of Units solely in reliance upon the information contained in the [PPM] and not in reliance upon any other information.

\*\*\*

3. I or my Offeree Representative have [sic] had an opportunity to ask questions of and receive answers from the General Partner, or a person or persons acting on its behalf, concerning the terms and conditions of this investment."

The Partners III offering closed on December 31, 1985, with 272 units having been sold for a total limited partner investment of $13.6 million. Of the total investment, $1.7 million was invested by partners and employees of Blair.

In 1985, Partners III purchased Holcomb Place Office Building (Holcomb Place) in Atlanta, Georgia. In September of 1986, Congress passed the Tax Reform Act of 1986 which provided that a taxpayer could no longer deduct losses from "passive" activities in which the taxpayer did not materially participate against income derived from active businesses. On October 28, 1986, Partners III purchased the Lincoln Center in Tampa, Florida. The acquisition was financed in part with an $11 million short-term loan from the First National Bank of Chicago, and the purchase agreement included management fees for WBRS.

In March of 1988, WBRS sent a letter to the limited investors in Partners III stating that although the partnership was well capital-

ized for the following two years, market risks required conservative management of the partnership resources and a cash distribution would not be made for 1987. On September 27, 1988, WBRS advised investors that debt service on the bank loan and continuing rental concessions were expected to cause negative cash flow from Lincoln Center for as long as two years and that a cash distribution for 1988 was not expected. The letter further advised investors that Plumwood and Blair had agreed that WBRS would not engage in any further real estate syndications. The letter stated that Plumwood would continue to perform the managing general partner function and that Blair "would continue to provide its counsel and support."

On June 26, 1989, Plumwood, the general partner of WBRS, wrote to investors telling them that at Blair's suggestion a management company had been hired to manage the day-to-day operations of the partnership properties which WBRS had been managing until then. In late 1989, the bank loan was in default and one of the partnership properties was threatened with foreclosure. On November 6, 1989, Blair loaned $500,000 to Partners III in an attempt to prevent the foreclosure. In a letter to investors on December 13, 1989, Blair stated that it was under no legal obligation to make the loan, but that it did so in an attempt to give WBRS additional time to work out a solution. The letter then stated that Blair had "put Plumwood on notice that Blair will not make additional loans." In letters dated December 21, 1989, and March 23, 1990, Blair again informed investors that it made the loan to Partners III not out of legal obligation, but rather to be supportive of the limited partners, many of whom were partners or employees of Blair. Blair also stated that it had reviewed reports prepared by certain real estate firms which concluded that additional capital infusions would not increase the value of Lincoln Center or result in positive equity for the limited partners. In April 1990, the bank foreclosed on Holcomb Place.

The plaintiffs filed their initial complaint on November 16, 1990, suing on behalf of themselves individually and on behalf of two putative classes. Class I was alleged to include all limited partners in Partners III excluding the defendants and any general partners of Blair. Class II was alleged to be a subset of Class I consisting of those investors who had borrowed funds to purchase their interests in Partners III from lending institutions to which they were referred by Blair. The plaintiffs' 10-count amended complaint alleged statutory and common law fraud, breach of fiduciary duty, breach of implied contract, negligent misrepresentation and State securities regulation violations. On appeal, the plaintiffs challenged the trial court's ruling only insofar as it dismissed the statutory and common law fraud, breach of fiduciary duty and misrepresentation claims.

Essentially, the plaintiffs alleged that their decision to invest in Partners III was based upon oral misrepresentations by the defendants which differed from the written representations contained in the PPM. The complaint alleges that during the solicitation of the limited partnership interests in Partners III, "various brokers employed by, or agents of, the Defendants represented to the Class Plaintiffs and each of the individual Plaintiffs that BLAIR would stand behind the limited partnership in that BLAIR would be the capital source of funds necessary to properly fund the real estate holdings of PARTNERS III should the need arise." The complaint further alleges that the defendants provided potential investors in Partners III with a brochure which stated that "[b]acked by the financial security of WILLIAM BLAIR & COMPANY, WILLIAM BLAIR REALTY SERVICES can truly work with the investor in mind."

The complaint also alleged that Blair had a reputation in the financial community of financial acumen and success, and that the defendants designed the sale of shares in Partners III to make it appear that Partners III was a product "created by BLAIR, financially backed by BLAIR, and supported by BLAIR's reputation, credibility and financial strength." According to the complaint, the defendants accomplished this by using the Blair name, office, address, telephone number, cable, telex and typeface in connection with the sale of shares in Partners III. The plaintiffs were allegedly told that Blair was described as a limited partner in WBRS by the PPM "for tax and other regulatory reasons."

With respect to the breach of fiduciary duty count, the complaint alleged essentially that the defendants breached their fiduciary duty to the plaintiffs included in class I by purchasing the Lincoln Center property after the enactment of a new tax law which eliminated the right of a taxpayer to deduct losses from "passive" activities in which the taxpayer did not materially participate against income derived from active businesses. The complaint alleged that the acquisition of Lincoln Center increased the economic risk to the plaintiffs but presented little risk to the defendants "because [the] Defendants earned management fees for operating Lincoln Center."

With respect to the misrepresentation claim, the complaint alleges that the members of class II were advised "by various BLAIR partners and/or by broker-dealers or sales representatives *** that any sums borrowed [from lending institutions to which the plaintiffs were referred by Blair] for the purpose of purchasing shares in PARTNERS III would not have to be repaid" until the partnership properties were sold. The complaint further alleged that contrary to

those representations, the loans "are, or will be, due and owing regardless of whether any building[s] are ever sold."

The complaint alleged that at the date of its filing, the shares in Partners III were worthless.

The defendants' motion to dismiss pursuant to section 2—615 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—615) for failure to state a cause of action alleged that the plaintiffs' allegations of fraud were not sufficiently specific; that the complaint failed to set out any misrepresentations on which the plaintiffs could have justifiably relied; that there were no allegations in the complaint that the misrepresentations proximately caused the plaintiffs' losses; and that there were no facts to support a claim for breach of fiduciary duty. The trial court granted the defendants' motion. The court also granted a motion by the defendants under section 2—619, ruling that several of the plaintiffs' claims were barred by the applicable statutes of limitations. The plaintiffs subsequently filed a motion for leave to file an amended complaint, for clarification of the dismissal order and for reconsideration of that order. The court denied the plaintiffs' motion, and the plaintiffs have appealed.

■ The plaintiffs first contend that the trial court erred in dismissing their common law fraud claim for failure to state a cause of action. The defendants respond that the plaintiffs did not allege misrepresentations upon which they could have justifiably relied.

The elements of the tort of fraudulent misrepresentation are:

" '(1)[a] false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in [justifiable] reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.' " (*Gerill Corp. v. Jack L. Hargrove Builders, Inc.* (1989), 128 Ill. 2d 179, 193, 538 N.E.2d 530, 536, quoting *Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286, 402 N.E.2d 599, 601.)

A party pleading fraud must allege facts sufficient to establish that its reliance on the alleged misrepresentations was justified, that is, that it had a right to rely upon the statement. (*Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.* (1986), 114 Ill. 2d 278, 288, 499 N.E.2d 1319.) In determining whether reliance was justifiable, all of the facts which the plaintiff knew, as well as those facts the plaintiff could have learned through the exercise of ordinary prudence, are taken into account. (*Central States Joint Board v. Continental Assurance Co.* (1983), 117 Ill. App. 3d 600, 606-07, 453 N.E.2d 932.) "A person may not enter into a transaction with his eyes closed to available information and then charge that he has

been deceived by another." *Central States,* 117 Ill. App. 3d at 606, 453 N.E.2d at 936.

In the case at bar, the plaintiffs were given a lengthy and detailed PPM which disclosed that WBRS was the general partner of Partners III and that the general partner was required to make a capital contribution of only $100. The PPM further disclosed that Plumwood was the general partner of WBRS and that Blair was the limited partner of WBRS. Blair was not mentioned as a partner, either general or limited, in Partners III. The PPM cautioned prospective investors that investing in Partners III involved a high degree of risk. As an unregistered offering of securities, interests in Partners III were offered only to accredited investors and a small number of nonaccredited investors who were required to meet certain eligibility requirements. Before being allowed to invest, prospective investors including the plaintiffs were required to sign a subscription agreement warranting that they had read the PPM and made the decision to invest relying solely on the information contained in the PPM and not in reliance on any other information. The plaintiffs nevertheless alleged in their complaint that "various brokers employed by, or agents of, the Defendants" represented to them that Blair would financially back Partners III and that Blair was identified as the limited partner of WBRS in the PPM only for tax and regulatory purposes.

We are not persuaded by the plaintiffs' argument that they could have justifiably relied upon the alleged oral misrepresentations in light of the written information contained in the PPM. The plaintiffs acknowledge that they signed a subscription agreement warranting that they relied only on the information contained in the PPM. However, they argue that this factor is not entitled to much weight because another section of the subscription agreement invited the plaintiffs to rely upon oral and written information outside the four corners of the PPM. The section to which the plaintiffs refer states, "I or my Offeree Representative have had an opportunity to ask questions of and receive answers from the General Partner, or a person or persons acting in its behalf, concerning the terms and conditions of this investment." The PPM itself states that the general partner would answer questions and make available any information "necessary to verify the accuracy of any information set forth in this Memorandum or the attached Exhibits." The plaintiffs claim that when they responded to the invitation and asked questions, they were told that Blair would financially back Partners III and that it was described in the PPM only as a limited partner of WBRS solely for tax and regulatory reasons. These oral representations were

directly contrary to what was stated in the PPM. We cannot accept the plaintiffs' argument that the provisions in the subscription agreement and PPM inviting them to ask questions concerning the investment and to verify the accuracy of the information given can reasonably be interpreted as authorizing the plaintiffs to rely on representations totally at odds with the written statements in the PPM. To accept the plaintiffs' contention is to hold the written agreement for naught. Similarly unpersuasive are the plaintiffs' claims that Partners III "looked" like a Blair product because it used the same typeface on its letterhead and shared office space with Blair. In our view, the complaint does not state facts from which it could be concluded that there was justifiable reliance on the part of the plaintiffs. The court was therefore correct in dismissing the common law fraud count.

■ The plaintiffs also claim that Blair's "pre- and post-investment activities" were those of a full partner and argued that by engaging in those activities it assumed the role of a general partner. The plaintiffs do not state what consequences would flow from treating Blair as a general partner other than to assert that they had a right to "rely upon continuing conduct representing Blair's intent to financially back Partners III." Although it is unclear, the plaintiffs appear to argue that if Blair is determined to have assumed the role of a general partner, it would have had a duty to make additional capital contributions to Partners III. This argument ignores the clear wording of the PPM, which states not only that WBRS was the general partner of Partners III, but also that the general partner was required to make a capital contribution to the partnership of only $100. We are not persuaded by the plaintiffs' argument on this point.

The plaintiffs also allege a cause of action under the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act). (Ill. Rev. Stat. 1989, ch. 121½, par. 261 *et seq.*) The Consumer Fraud Act states:

"[U]nfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' *** in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." Ill. Rev. Stat. 1989, ch. 121½, par. 262.

■ The Consumer Fraud Act provides greater protection than the common law action for fraud, and a plaintiff suing under the Act need not establish all of the elements of common law fraud. (*First Security Bank v. Bachleda* (1987), 165 Ill. App. 3d 725, 731, 520 N.E.2d 660, 664.) Those elements of a cause of action which must be established to sustain an action under the Consumer Fraud Act were set forth in *Siegel v. Levy Organization Development Co.* (1992), 153 Ill. 2d 534, 607 N.E.2d 194. After examining the language of the Act, the *Siegel* court noted that reliance was not an element of a cause of action pursued under the Consumer Fraud Act, unlike an action for common law fraud. The court specifically stated:

"On its face, it appears that all a plaintiff need prove to establish a violation of the Act is: (1) a deceptive act or practice, (2) intent on the defendants' part that plaintiff rely on the deception, and (3) that the deception occurred in the course of conduct involving trade or commerce. Significantly, the Act does not require actual reliance." *Siegel*, 153 Ill. 2d at 542, 607 N.E.2d at 198.

This statement was recently repeated in *Martin v. Heinold Commodities, Inc.* (1994), 163 Ill. 2d 33, 75-76, 643 N.E.2d 734, 754.

Because actual reliance is not an element of a consumer fraud action, the conflict between the oral and written representations identified by the plaintiffs is not fatal to the consumer fraud claim. However, as in any other tort, to sustain a cause of action under the Consumer Fraud Act, the plaintiffs must further allege that damages were proximately caused by the fraud. *Martin*, 163 Ill. 2d at 58-59, 643 N.E.2d at 746-47.

■ *Martin* concluded that, in securities investment cases where the plaintiffs allege that they have suffered a financial loss and file an action under the Consumer Fraud Act, loss causation must be shown before there can be any recovery of damages. (*Martin*, 163 Ill. 2d at 60-61, 643 N.E.2d at 747.) The *Martin* court defined loss causation as meaning that " 'the investor would not have suffered a loss if the facts were what he believed them to be.' " (*Martin*, 163 Ill. 2d at 60, 643 N.E.2d at 747, quoting *LHLC Corp. v. Cluett, Peabody & Co.* (7th Cir. 1988), 842 F.2d 928, 931.) Quoting Federal law, the court further explained the term:

" 'The plaintiff must prove not only that, had he known the truth, he would not have acted, but in addition that the untruth was in some reasonably direct, or proximate, way responsible for his loss.' " *Martin*, 163 Ill. 2d at 60, 643 N.E.2d at 747, quoting *Huddleston v. Herman & MacLean* (5th Cir. 1981), 640 F.2d 534, 549.

■ We conclude that the facts presented in the case at hand bear a striking resemblance to the facts before the *Martin* court. Both the plaintiffs in *Martin* and the plaintiffs here made a decision to invest

in a risky securities investment. Like *Martin*, the plaintiffs in this case alleged that there was a misrepresentation which occurred before the purchase of shares in the investment. Finally, like *Martin*, the plaintiffs here lost the money which they invested and subsequently sued the offeror of the securities, alleging a violation of the Consumer Fraud Act. *Martin* concluded that loss causation must be shown before the plaintiffs can recover damages. Heeding the instruction of our supreme court, we likewise hold that these plaintiffs must allege loss causation in their complaint.

Consequently, the plaintiffs must allege more than that they would not have invested in the real estate syndicate "but for" the defendants' misrepresentations. Rather, to properly allege loss causation, the plaintiffs must show that their investment loss was caused by the misrepresentation of the defendants. Looking to *Martin* for guidance, we note that the question to be asked when analyzing this complaint is " 'Would the decline in plaintiff's investment have occurred even if defendant's misrepresentation had been true? If the answer to this question is "yes," plaintiff has failed to prove that the misrepresentation proximately caused the decline.' " *Martin*, 163 Ill. 2d at 62, 643 N.E.2d at 748, quoting W. Prosser, Torts § 110, at 732 (4th ed. 1971).

In their complaint, the plaintiffs allege, "[a]s a direct and proximate result of Defendants' action, the Class Plaintiffs and the members of Class I have been damaged significantly." However, the factual allegations pleaded throughout the complaint do not support this vague legal conclusion.

The plaintiffs have alleged that the defendants or their agents made three kinds of oral statements that conflicted with the written PPM. The plaintiffs allege they were told (1) that they would be receiving a Blair product; (2) that they would receive a product that was backed by Blair's financial strength and integrity; and (3) that Blair would "stand behind the limited partnership in that BLAIR would be the capital source of funds necessary to properly fund the real estate holdings of PARTNERS III should the need arise." These allegations lack specificity. The plaintiffs do not explain how, even if the defendants' misrepresentations had been true, the defendants' actions caused the decline in the value of the real estate investment.

Therefore, we conclude that the complaint does not properly allege loss causation and the trial court properly dismissed this count pursuant to section 2—615.

■ We turn, then, to the next issue raised by the plaintiffs concerning whether the plaintiffs had adequately alleged a cause of action under the Illinois Securities Law of 1953 (Illinois Securities Act or Act) (Ill. Rev. Stat. 1989, ch. 121$^{1}$/$_{2}$, par. 137.1 *et seq.*).

Section 12 of the Illinois Securities Act provides that it is a violation of the Act:

"F. To engage in any transaction, practice or course of business in connection with the sale or purchase [of] securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof;

G. To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." (Ill. Rev. Stat. 1989, ch. 121¹/₂, pars. 137.12(F), (G).)

The provisions of sections 12(F) and (G) of the Illinois Securities Act are patterned after sections 17(a)(2) and (a)(3) of the Federal Securities Act (15 U.S.C. §§ 77q(a)(2), (a)(3) (1988)). (*Foster v. Alex* (1991), 213 Ill. App. 3d 1001, 1005, 572 N.E.2d 1242.) Illinois courts therefore look to Federal case law to interpret these provisions. *Foster*, 213 Ill. App. 3d 1001, 572 N.E.2d 1242.

In *Acme Propane, Inc. v. Tenexco, Inc.* (7th Cir. 1988), 844 F.2d 1317, buyers of nonregistered securities brought a securities fraud claim based on alleged oral misrepresentations that contradicted the written information provided to them by the sellers. The court stated that only material representations permit recovery under the securities laws and that in order to be material, a statement must "significantly alter the total mix of information" available to the investor. (*Acme*, 844 F.2d at 1322.) The court went on to state:

"An investor who knew the truth is hard put to say that the inconsistent oral statement significantly altered the total mix of information. \*\*\* [T]he securities laws are designed to encourage the complete and careful written presentation of material information. A seller who fully discloses all material information in writing should be secure in the knowledge that it has done what the law requires. Just as in the law of contracts a written declaration informing one party of an important fact dominates a contrary oral declaration, so in the law of securities a written disclosure trumps an inconsistent oral statement. Otherwise even the most careful seller is at risk, for it is easy to claim: 'Despite what the written documents say, one of your agents told me something else.' If such a claim of oral inconsistency were enough, sellers' risk would be greatly enlarged. All buyers would have to pay a risk premium to cover this extra cost of doing business." (*Acme*, 844 F.2d at 1322.)

(Accord *Associates in Adolescent Psychiatry, S.C. v. Home Life Insurance Co.* (7th Cir. 1991), 941 F.2d 561, 571, *cert. denied* (1992), 502

U.S. 1099, 117 L. Ed. 2d 426, 112 S. Ct. 1182 ("Documents that unambiguously cover a point control over remembered (or misremembered, or invented) oral statements").) We accordingly do not believe that the plaintiffs have alleged a cause of action based on a violation of the securities laws.

■ The plaintiffs next contend that the trial court erred in dismissing their breach of fiduciary duty claims. The plaintiffs primarily argue that the court should not have dismissed the claim as to WBRS, the general partner of Partners III, and Plumwood, the general partner of WBRS. The gist of this claim is the plaintiffs' allegation that the defendants breached a fiduciary duty by acquiring the Lincoln Center property despite an unfavorable change in the tax laws. The plaintiffs maintain that WBRS received an economic benefit from the purchase in the form of management fees.

As stated earlier, the PPM states that "[t]he primary investment objective of the Partnership will be to locate and acquire suitable real estate properties and obtain capital appreciation through an increase in the value of the Properties." One of the "investment objectives" was to "generate reasonable Partnership tax losses from straight-line real estate depreciation to offset or 'shelter' a Unit holder's taxable income from other sources." The PPM warned investors, however, that "[t]he Partnership has not been structured primarily to produce tax benefits for the Investor Limited Partners, and the General Partner estimates *** only modest tax losses resulting from Partnership operations." Investors were further cautioned that Congress was considering changes in the tax laws that, if enacted, could significantly reduce or eliminate the tax benefits of an investment in the partnership. Investors were accordingly strongly urged to consult their own tax advisers about the possible effects of tax law changes before investing. The defendants maintain that the acquisition of the Lincoln Center property was in full conformity with the primary investment objective of the partnership and could therefore not have formed the basis of a claim for breach of fiduciary duty.

The plaintiffs cite *Labovitz v. Dolan* (1989), 189 Ill. App. 3d 403, 545 N.E.2d 304, to support their argument that even an act permitted under a partnership agreement may constitute a breach of fiduciary duty where the general partner benefits at the expense of the limited partners. The private placement memorandum in *Labovitz* stated that the partnership's intended policy was to make cash distributions to partners each year in an amount approximating the taxable income for the year. It also stated that the general partner would have the sole discretion to determine the amount of cash distributions to be made. The plaintiff limited partners alleged that

even though the partnership had sufficient cash to fund the plaintiffs' tax obligations, the defendants unreasonably refused to make cash distributions while making loans to other entities related to the defendants. As a result, the plaintiffs were forced to sell their interests to an affiliate controlled by the defendant for two-thirds of their book value in order to obtain cash to pay their tax liabilities. In holding that these allegations were sufficient to state a cause of action for breach of fiduciary duty, the court stated that the gravamen of the complaint was that the plaintiffs had taken the risk that the business would succeed but had not taken the risk that it would succeed so well that the general partner would squeeze them out and take the profits for itself.

In the case at bar, the plaintiffs were fully informed that the purpose of the partnership was to acquire real estate, that it was not primarily structured to generate tax losses and that unfavorable tax law changes could reduce or eliminate the tax benefits. The PPM also discussed possible conflicts of interest based on the general partners' management of the partnership properties and how those conflicts would be resolved. Essentially, the plaintiffs premised their breach of fiduciary duty claim on the defendants' failure to abandon the primary purpose of the partnership in the face of tax law changes. We do not believe that the defendants had a duty to do so and accordingly find that the fiduciary duty claim was properly dismissed.

■ The plaintiffs also appeal the dismissal of their claim for misrepresentation based on alleged representations to members of class II that funds borrowed from lending institutions to which the plaintiffs were referred by Blair would not have to be repaid until the partnership properties were sold. In their motion to dismiss, the defendants stated that the allegations concerning the misrepresentation count did not state any actionable representation on which the plaintiffs could have reasonably relied and did not allege that the purported misrepresentations proximately caused the plaintiffs' losses. In their brief on appeal, the plaintiffs make no argument as to how the trial court erred in dismissing the misrepresentation claim. We accordingly find the issue waived for purposes of this appeal. *Thrall Car Manufacturing Co. v. Lindquist* (1986), 145 Ill. App. 3d 712, 719, 495 N.E.2d 1132.

■ Finally, the plaintiffs contend that the court erred in denying them leave to amend their complaint. The plaintiffs tendered an amended complaint to the trial court along with their motion to reconsider. According to the plaintiffs, the proposed amended complaint offered more specific factual information to support their allegations that they had no knowledge or reason to suspect fraud

until they received communications directly from Blair in December of 1989. The amended complaint did not allege any new facts to establish that the plaintiffs' reliance on the alleged misrepresentations was reasonable.

The denial of a motion to file an amended complaint will be affirmed unless the plaintiff can demonstrate an abuse of discretion. (*B.C. v. J.C. Penney Co.* (1990), 205 Ill. App. 3d 5, 16, 562 N.E.2d 533.) One of the factors to be considered in determining whether an abuse of discretion occurred is whether the proposed amendment would cure the defective pleading. In our view, the trial court properly concluded that the proposed amendment would not have cured the defective pleading. Therefore, no abuse of discretion occurred.

Our disposition of this cause makes it unnecessary for us to consider whether certain of the plaintiffs' claims were barred by the applicable statute of limitations.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

CAHILL and S. O'BRIEN, JJ., concur.