2019 IL App (1st) 182447

Fourth Division
September 26, 2019

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

|  |  |  |
|---|---|---|
| ADAM PACK and JENNIFER PACK, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellees, | ) ) |  |
|  | ) | No. 16 L 1501 |
| v. | ) ) | The Honorable |
| MAGDALENA MASLIKIEWICZ, | ) ) | Jerry A. Esrig, Judge Presiding. |
| Defendant-Appellant. | ) ) |  |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion. Justices Reyes and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1      After a bench trial, defendant, Magdalena Maslikiewicz, was found liable for common-law fraud and for violating the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 2016)), in connection with her sale of a single-family residence to plaintiffs, Adam and Jennifer Pack. A judgment was entered in favor of plaintiffs and against defendant for $148,119.50, plus costs and attorney fees of $68,444.79. Defendant appeals, claiming that (1) the trial court's findings were against the manifest weight of the evidence, (2) the trial court erred in finding the Consumer Fraud Act

applicable, (3) the trial court erred in admitting certain evidence, and (4) the trial court erred in awarding attorney fees and costs. For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3                                    I. Complaint

¶ 4        On February 16, 2016, plaintiffs filed a verified two-count complaint against defendant. Count I was for common-law fraud and alleged that plaintiffs were the owners of a single-family home on North Moody Avenue, which they agreed to purchase from defendant on October 28, 2013. Defendant had previously purchased the home and rehabbed it, advertising that the property was for sale as a " 'complete renovation.' " Plaintiffs alleged that defendant's purchase and renovation of the property was "solely for ultimate sale and commercial gain" and that defendant never resided at the home. Plaintiffs alleged that they executed a real estate sales contract to purchase the residence "based upon defendant's marketing representations that there had been a complete renovation along with the representations in the contract in which defendant denied any issues or problems with the residence including specifically the basement, foundation, electrical or HVAC systems."

¶ 5        Plaintiffs alleged that defendant was "directly and intimately involved with the original purchase of the property and the subsequent construction activities," and that prior to listing the property for sale, defendant "had actual or presumed knowledge" as to the condition of the property, including the scope of any renovation construction activities. Plaintiffs further alleged that defendant was "directly and intimately involved" with the marketing of the property and "was aware of and had actual or presumed knowledge" of the conditions and defects alleged in the complaint. However, plaintiffs alleged that defendant falsely denied the existence of any alleged issues, including during the interim period between execution of the

contract and the December 4, 2013, closing, "with the intent of inducing [plaintiffs] to rely upon the statements and misrepresentations and complete the purchase [of] the property."

¶ 6    Plaintiffs alleged that the defects present within the property were known to defendant but "were covered up and hidden during the ordinary and normal course of construction and could not have been discovered by" plaintiffs. Plaintiffs further alleged that the defects were "apparent and known only by defendant as the renovation construction did not comply with applicable construction standards and codes as well as construction customs and practices." Plaintiffs alleged that they relied on defendant to complete the renovation construction of the home in compliance with the applicable construction standards and codes and that they did not know, and could not have known, that the renovation construction did not comply with applicable construction standards and codes.

¶ 7    Plaintiffs alleged that after the execution of the contract, but prior to closing, they asked defendant several questions about the property, including "questions relating to water infiltration and improper electrical service." Defendant denied the existence of any water infiltration and represented that the electrical service was adequate and appropriate; plaintiffs alleged that they relied on these denials. However, after the closing, plaintiffs discovered multiple issues concerning water infiltration and the electrical service and also discovered that the representations defendant had made concerning " 'new appliances' " were false. Due to these issues, plaintiffs retained multiple contractors to inspect the home.

¶ 8    Plaintiffs alleged that the contractors informed them of numerous defects and problems with the home, including:

> "a. Failure to waterproof the basement;
>
> b. Failure to install drain tile in the basement;

c. Failure to demolish the existing walls when performing renovation construction of the basement;

d. Improper electrical grounding in the basement wiring;

e. Buried electric boxes in the basement walls;

f. Failure to install proper load bearing support beams in the basement;

g. Failure to properly construct the basement floor."

Plaintiffs alleged that as a result of defendant's knowing failure to comply with applicable building codes and construction customs and practices, plaintiffs had spent substantial sums of money to identify and correct the defects.

¶ 9    Count II of the complaint alleged the same facts as in count I but alleged that defendant's conduct constituted deceptive acts and business practices in violation of the Consumer Fraud Act.

¶ 10                              II. Pretrial Proceedings

¶ 11    After the denial of a motion to dismiss, the parties proceeded to discovery, and defendant filed a motion for summary judgment, which was denied on November 13, 2017. On December 6, 2017, defendant filed a motion to bar the testimony of David Larkin, the president of DAL Builders (DAL), the contractor who discovered and repaired the alleged defects in the home. Defendant claimed that plaintiffs had indicated during the briefing on the motion for summary judgment that Larkin would serve as an expert in their case, but that Larkin had, in fact, never agreed to be their expert. Defendant further argued that the supplemental disclosures under Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007) naming Larkin as an expert were untimely since they were filed after the court's deadline. Finally, defendant claimed that the alleged opinions set forth in the supplemental disclosures were

insufficient and did not provide a basis for any of Larkin's opinions. Accordingly, defendant sought to bar Larkin's testimony.

¶ 12    Attached to the motion to bar was an undated certification by Larkin, in which he stated that "nobody ever asked me to act as an expert or offer any opinions related to any work performed by others and I have no opinions one way or the other on the work performed by any other persons." Larkin further stated that "I do not have any opinions to provide in this case including opinions that there was [*sic*] 'code violations and construction defects as well as the scope of the construction activities.' " Attached to his certification were e-mails between Larkin and defendant's counsel,[1] in which defense counsel stated that he had discovered that DAL's work was performed without permits and indicated that he "[would] have no choice but to alert the proper authorities about the illegal work and ask that the City of Chicago conduct an investigation into DAL and its business practices in the City of Chicago." However, defense counsel stated that "[o]f course, if [plaintiffs] agree to dismiss the case immediately with prejudice or if DAL tells me in writing that they will withdraw any and all testimony in this case, then the matter will be dropped." Larkin responded that "if it is a[n] option to withdraw all testimony and not be involved with this case at all I am all for that option. Let me know what needs to be done so I am done with all this." In later e-mails, Larkin reaffirmed that he would not be acting as an expert in the matter.

¶ 13    Also attached to the motion to bar was a June 5, 2017, case management order providing that the parties were to answer Rule 213(f) interrogatories by August 3, 2017, and that depositions of Rule 213(f)(1), (2), and (3) witnesses were to be completed by September 3, 2017. The order also provided that the parties "waive 60 day rule for expert discovery."

---

[1]We note that counsel representing defendant on appeal is not the same counsel that represented defendant below.

¶ 14        Finally, attached to the motion to bar was an unfiled copy of plaintiffs' supplemental Rule 213 disclosures, in which plaintiffs stated that Larkin, "previously disclosed as a witness," was additionally "expected to testify to the following defects and code violations:"

"1. New basement walls having been constructed in front of existing (old) walls.

2. The pre-existing 'old' walls had clear evidence of water damage and staining.

3. Debris and garbage was stuffed between the old and new walls.

4. Buried live electrical connections in the old wall, which created a fire hazard.

5. Improper grounding of the water service.

6. Improperly wired switches.

7. Improper use of BX in electrical wiring.

8. Improper excavation of the old concrete floor and pouring of a new concrete floor directly onto clay. The excavation of the old floor was not sufficiently deep and there was a failure to properly prepare the base with gravel and rebar. The existing water and sewer lines were not replaced and buried within the new floor. The result was that the 'new' concrete floor heaved and cracked.

9. The posts supporting the basement ceiling were not properly secured in the concrete. No piers were constructed. When the old basement floor was excavated, the existing area which surrounded the post was left with the new floor poured around. The existing concrete 'supporting' the posts was crumbling, causing a structural issue.

10. Concrete and debris from the basement demolition and excavation was found buried in the crawl space."

The supplemental disclosure also provided that "Mr. Larkin is further expected to testify consistent with the notes taken during the project, previously identified as Exhibit 6 and discussed during plaintiffs' depositions."

¶ 15     In response, plaintiffs claimed that Larkin had been timely disclosed as an expert. They claimed that he was first disclosed in plaintiffs' answers to interrogatories on March 7, 2017, which were supplemented on August 3, 2017, and which were further supplemented, following defendant's refusal to depose Larkin, on September 14, 2017, more than 90 days prior to trial. Plaintiffs also noted that the 60-day rule for expert discovery had been waived per the June 5, 2017, case management order.

¶ 16     Plaintiffs further claimed that they had disclosed the basis for Larkin's opinions by producing copies of DAL's records, which included records reflecting DAL opinions and observations, and that both plaintiffs testified in their depositions concerning DAL's scope of work, observations, and opinions. Plaintiffs claimed that defense counsel chose not to depose Larkin, cancelling his scheduled deposition and refusing to reschedule, and also "emphasize[d]" that defense counsel had "engaged in a series of threatening emails to the witness as well as plaintiffs' counsel." Finally, plaintiffs claimed that the first time they had seen Larkin's "certification" was in connection with the motion to bar and that they had not had the opportunity to depose Larkin as to its contents or the circumstances under which it was procured.

¶ 17                                             III. Trial

¶ 18     The parties came before the trial court for a bench trial on December 18 and 19, 2017. Prior to trial, the court addressed defendant's motion to bar Larkin's testimony. The court denied the motion, finding that Larkin had timely been identified as a Rule 213(f)(1) and

7

potential Rule 213(f)(2) witness. The court further advised defendant that if Larkin testified to an opinion that counsel felt had not been properly disclosed, the court would rule on the objection at that time.

¶ 19                                    A. Plaintiffs' Case-in-Chief

¶ 20                                                1. Defendant

¶ 21          Plaintiffs' first witness was defendant, who testified as an adverse witness. Defendant testified that she came to the United States from Poland, where she had received a master's degree in economics. She was residing with Arthur Maliszewski at a home in Norridge at the time she purchased the subject property in November 2012 and continued to live with him at the time of trial; defendant testified that Maliszewski was the owner of Midwest Electric, Inc. (Midwest), one of the contractors that performed work on the subject property. Defendant further testified that Maliszewski was the individual who defendant relied on as her construction representative during the renovation of the subject property.

¶ 22          Defendant testified that, prior to the purchase of the subject property, she had purchased two other properties: a condo that she continued to own and a single-family home that she sold for a profit in 2012. Defendant also purchased three additional properties after the purchase of the subject property, all of which had been sold for a profit.

¶ 23          Defendant testified that she visited the subject property twice before closing on its purchase. During the attorney review period, in response to a question from defendant's attorney, the seller disclosed that there had previously been a leak in the basement three or four years ago, which the seller had not observed since that time. The seller also disclosed that she had no knowledge of any mold, seepage, or flooding problems, other than a 2008 roof leak and the leak in the basement; defendant testified that she did not consider the leak

in the basement to be a "basement leak" because "[i]t was connected to the leak from the roof." Since she believed the source of the leak was the roof, which had been repaired, defendant testified that she did not hire a contractor to investigate the source or cause of the basement leak.

¶ 24    Defendant testified that the subject property was listed for sale in 2013; defendant prepared the description of the property used in the listing in connection with the listing agency. Plaintiffs eventually made an offer on the property, and the parties signed a contract for the sale of the property in October 2013. Defendant confirmed that one page of the contract was entitled " 'Residential Real Property Disclosure Report' " and that she filled out and signed this page. On the form, defendant answered "no" to questions asking whether she was aware of any flooding or recurring problems in the basement, any leaks or material defects in the roof, any defects in the walls or floors, any defects in the electrical system, or any defects in the plumbing system. Defendant was aware that this information was going to be given to purchasers and that the purchasers would rely on the information contained on the form.

¶ 25    Defendant testified that, during the attorney review period, plaintiffs' attorney asked questions about the condition of the basement, and defendant did not disclose the prior basement leak because "[t]hat was four years before, and they said they never had the same problem again."

¶ 26    Defendant testified that the only permit obtained for the renovation of the subject property was a permit for the exterior work on the home. There was no permit for any interior work, and the City of Chicago did not inspect the plumbing or electrical work. Defendant testified that she visited the property "from time to time" during the renovations,

and that she had the ability to visit at any time because she had keys to the property. Defendant identified a lien waiver signed by Maliszewski on December 31, 2013, with respect to the work performed on the subject property but did not have a canceled check to corroborate payment.

¶ 27    Defendant testified that Maliszewski decided what repairs should be made on the property and that she relied on Maliszewski on that subject. Defendant testified that she "didn't have enough knowledge to really decide what should be repaired and what shouldn't." Defendant was aware that drywall work was involved in the basement. Defendant also observed hairline cracks on the concrete basement floor during the renovation, which she asked to be repaired. Defendant was not aware of how the repairs were performed, but "just [knew] that it was fixed."

¶ 28                                    2. Plaintiff Adam Pack

¶ 29    Plaintiffs' next witness was plaintiff Adam Pack,[2] who testified that he was currently employed with the Evanston Police Department. He and plaintiff Jennifer Pack, his wife, closed on the purchase of the subject property on December 4, 2013, and had lived there continuously since that date. Adam was first introduced to the property through plaintiffs' realtor and reviewed a listing posted concerning the property, which included a statement that the property was a "complete renovation." Adam testified that the characterization of the property as completely renovated was significant to him because he and Jennifer were looking for a property that needed no additional work. Adam further testified that, in his mind, a "complete renovation" meant "finding any defects or issues with a property, fixing them. New mechanicals, new roof, plumbing, electrical. Any kind of issues that would have

_____

[2]Since both plaintiffs have the same last name, we refer to them by their first names when discussing them individually.

been observed by the seller would be fixed." Adam testified that when he and Jennifer visited the property, it "looked very nice" and he was unable to observe any litter or debris.

¶ 30    Adam testified that when plaintiffs made their decision to purchase the property, they relied on the listing, as well as on defendant's disclosures on the real estate disclosure form. Adam further testified that, when they visited the property, plaintiffs noticed a musty smell from the basement, which their attorney contacted defendant's attorney about. Defendant responded by representing that she had not noticed any water penetration since purchasing the property. Adam testified that plaintiffs also hired a home inspector, but the inspector would not have been able to perform any testing of the basement walls that involved destruction of the drywall.

¶ 31    Adam testified that plaintiffs moved into the property the weekend after the closing. In the spring or summer of 2014, after a heavy rain, plaintiffs observed water in the basement. Adam purchased a shop vacuum and dehumidifier, which appeared to resolve the problem. In June 2015, after another heavy rain, the basement again flooded, this time with several inches of water filling the entire basement. Plaintiffs filed a claim with their insurance company for damages, which was paid. Plaintiffs contacted a water remediation company, which came out and removed the water; as part of the remediation, the company also removed the wet carpeting and punctured holes along the bottom of the wall in order to air out the drywall. As a result, plaintiffs needed to repair the drywall and replace the carpeting. Plaintiffs also contacted U.S. Waterproofing in order to address the cause of the water infiltration; the company ultimately installed drain tile in the basement. The company also dug out concrete along the inside wall of the basement, and when Adam observed the foundation walls, he was able to observe "some honeycombing in spots, as well as cracks in the foundation."

¶ 32    To prepare the area for U.S. Waterproofing, plaintiffs removed the bottom four feet of drywall throughout the basement, in order to expose the foundation. When they did so, Adam testified that he observed debris hidden behind the drywall, such as clothing and garbage. Adam also observed that there was another layer of blue drywall and framing that was hidden behind the new drywall; there were also areas of discoloration on the blue drywall. There were also electrical outlets behind the drywall, as well as BX cable running from the electrical outlets. Finally, Adam observed that there was a gap between the floor and the old, blue drywall.

¶ 33    Adam testified that he thought the discoloration of the blue drywall and the presence of the electrical items behind the drywall was "odd," so he contacted a home inspector to inspect the basement. Adam testified that he believed that the electrical work in the basement was not up to code, and that there was evidence of prior water infiltration in the basement that had been hidden. After the home inspector completed his inspection, he issued a report naming a variety of conditions that he observed in the basement.

¶ 34    After the inspection, Adam removed all of the drywall and framing to expose the entire foundation of the basement in order to repair all of the defects in the basement. In doing so, Adam discovered hidden outlets and light switches, more debris, leftover drywall, and concrete pieces. Adam also observed insulation that was located only around the water meter, as well as a wire running from the water meter that was connected to a screw in a way to make it appear that the wire was grounded. Adam further observed BX cable running throughout the entire basement, exposed wires, and discolored and mildewed portions of the blue drywall.

¶ 35     Adam testified that plaintiffs hired a company known as DAL to perform repairs on the basement and, in doing so, DAL discovered additional defects. For instance, DAL discovered that certain support posts "were not connected to anything" and were held up by two crumbling concrete blocks. Adam was present during the course of DAL's work and spoke with DAL's representative and discussed the findings.

¶ 36     Adam testified that there were also issues with the appliances, where water began pooling under the refrigerator. The manufacturer asked Adam for the serial number and the model number, and Adam discovered that the sticker with that information had been removed. Due to the missing information, Adam was unable to make a warranty claim for the repair.

¶ 37     On cross-examination, Adam testified that neither he nor Jennifer had any direct communication with defendant prior to the filing of the lawsuit. He identified several statements in the listing that he believed were false, including " '[c]omplete renovation,' " " '[t]op of the line stainless steel appliances' " and " '[n]ew *** mechanicals.' " Adam admitted that the very bottom of the listing contained a disclaimer, which he had read, providing that " 'The accuracy of all information, regardless of source, including, but not limited to, square footages and lot sizes, is deemed reliable, but not guaranteed, and should be personally verified through personal inspection by and/or with the appropriate professional.' " Adam further testified that plaintiffs had hired a home inspector prior to closing, who issued a report. Adam also testified that there were several statements in the disclosure form that were false, including statements that there were no material defects in the basement or foundation.

¶ 38     Adam testified that he believed that DAL had obtained any necessary permits for its work and identified a permit that had been issued for the plumbing work.

13

¶ 39                                    3. David Larkin

¶ 40        Next, David Larkin testified that he was the owner of DAL and had been involved in the construction business since 1989, when he was in high school. Larkin worked for a small remodeling company and then started his own business in 1994, when he was 20 years old. Larkin testified that, through the course of his work, he had become familiar with various building codes, including those of the City of Chicago, and what was permitted under those codes. Larkin testified that his company completed 90 to 110 projects a year, which included structural work.

¶ 41        Larkin was given a copy of the certification that had been attached to the motion to bar his testimony and testified as to the circumstances surrounding its creation. Larkin testified that he "signed this basically because the other attorney has been threatening me with legal action from day one, and he basically told me if I do not, he will have a full investigation against every project that I have going and every project that I have done, and essentially that is it in a nutshell."

¶ 42        Larkin testified that DAL was called to plaintiffs' home due to water infiltration and, while there, suspected that there were structural issues in the basement given the appearance of the basement's structural columns and comments made by plaintiffs. DAL recommended that the drywall surrounding the structural columns be removed "to kind of see what was going on in there." DAL also participated in demolishing the drywall throughout the basement, and when it did so, Larkin observed construction debris behind the wall, which he opined was not a code violation but was "just poor workmanship." Larkin opined that some of the debris they uncovered would be considered "hazardous debris" because it was wet and moldy.

¶ 43        Larkin testified that it appeared that the basement had flooded at one point, so the bottom of the drywall had been removed in order to remove any moldy portions, and then an entirely new wall system had been constructed in front of the old walls. Larkin opined that he had "never seen anything like that." Similarly, in the bathroom, the old water shutoffs, outlets, and even tile remained behind the wall, such that "[t]hey pretty much just built a new wall right in front of the old one." Larkin testified that all of the electrical in the bathroom was still live. Larkin opined that such conduct was not consistent with good construction practices and that "[a]ll of that stuff needs to go. It's code violations. It's poor workmanship. It's everything. It's a huge, huge fire hazard, flooding hazards, you name it." Larkin also testified that it appeared that someone had attempted to lower the floor of the basement by cutting into the concrete, and testified that he was able to observe that "all of the other wall systems behind there, electric, plumbing, drywall, insulation, all of that was still in place." Larkin further opined that when the concrete floor was repoured, it was much too thin and the floor had not been properly prepared.

¶ 44        Larkin testified as to multiple code violations that he observed. First, he testified that there were buried live electrical boxes, as well as electrical boxes that had been moved and left with live wires dangling. Second, he testified that, in the bathroom, the plumbing, including shutoff valves, were buried behind the new walls, which was impermissible. Third, he testified that the main beam support posts were inadequately supported. Fourth, he testified that the concrete floor was too thinly poured, contained no substrate or moisture barrier, and did not contain metal reinforcement in the concrete slab as required. Finally, he testified that all of the new walls containing wiring had been wired with BX cable, a flexible

conduit, but that the code permitted only three feet of BX cable. Larkin also testified that the electrical to the house was not grounded, as required.

¶ 45     On cross-examination, Larkin testified that he held a general contractor's license with the City of Chicago and did not hold an electrical or structural engineering license. Larkin testified that DAL served as a general contractor and subcontracted areas such as electrical, which were performed by licensed electricians. Larkin testified that DAL and its subcontractors performed electrical, plumbing, and structural work, which would generally require permits. DAL obtained a permit for repairing water damage but was unable to obtain permits for other work because "the original work was never permitted to begin with, so it's impossible for me as a contractor *** to go get a permit to fix work that never should have been done in the first place." Defense counsel also asked Larkin to recite the numbers of various sections of the building code, but Larkin was unable to do so from memory.

¶ 46     Counsel asked Larkin if it was possible that the debris behind the wall had been there for a long period of time, and Larkin opined that, in his professional opinion, it had been there a few years at most due to the amount of dust present. Larkin further opined that if defendant was the one responsible for the walls, "it would be impossible not to know" of the debris behind the walls.

¶ 47                               4. Plaintiff Jennifer Pack

¶ 48     Next, plaintiff Jennifer Pack testified similarly to Adam, including testifying that one of the aspects of the home that appealed to plaintiffs was the fact that it was "turnkey," meaning that they would not need to perform any additional work on the property. Jennifer explained that after the June 2015 flooding, plaintiffs called U.S. Waterproofing to remedy the issue and to ensure that there would be no future flooding. U.S. Waterproofing informed plaintiffs

that the foundation would need to be exposed in order to assess the issue, and plaintiffs initially made a small hole in the drywall for that purpose. However, due to the debris, the foundation was not exposed, so U.S. Waterproofing requested that plaintiffs remove the drywall four feet from the floor in order to expose the entirety of the foundation. When plaintiffs did so, the second layer of drywall and the debris behind the new drywall was revealed. U.S. Waterproofing informed plaintiffs that this would need to be removed, so plaintiffs sought to perform the additional demolition but were "a little bit nervous" because they observed wires and "weren't really sure if it was safe" for them to perform the demolition themselves. They hired Mark Walsten, a home inspector, to inspect the basement to ensure that it was safe for plaintiffs to perform the demolition themselves. Based on Walsten's report, plaintiffs determined that it was not safe for them to perform the demolition, so they hired DAL to do it, and also hired DAL to repair the basement.

¶ 49                               5. Mark Walsten

¶ 50        Finally, Mark Walsten testified that he owned a home inspection business, which he began in 2005 after many years as a contractor. Walsten testified that plaintiffs retained him to inspect the basement of the subject property in 2015, which he did and after which he prepared a report summarizing his findings. Walsten testified that the standards for a home inspection provided for a visual inspection and did not permit any destructive testing. Walsten testified to several observations he made of the premises, including the fact that a grounding wire was not actually grounded to anything, the use of BX cable, and electrical outlets and switches that were covered by a layer of drywall. Walsten also observed garbage, which he testified served as a "red flag" for an inspector "because if you have something so

17

sloppy in the way it's done it makes you wonder how the rest of the work is done in the remodeling process of the structure."

¶ 51                                    B. Defendant's Case-in-Chief

¶ 52        After plaintiffs rested, defendant made a motion for a directed finding, claiming that there were no false statements of fact and that any statements were opinions. The court asked defense counsel if defendant's conduct could be considered deceptive acts under the Consumer Fraud Act, and counsel argued that plaintiff had pleaded only that defendant's conduct constituted fraud under the Consumer Fraud Act, not that the conduct was deceptive. The court expressed skepticism that plaintiffs were limited to arguing fraud and noted that the law provided that a plaintiff could amend his pleadings to conform to the proof. The court noted that it was not making any comment on the substance of plaintiffs' pleadings because it had not examined them in depth but further noted that "there is clearly evidence of deceptive practice. Let me tell you this. If you've got a post in the middle of the floor that isn't structurally adequate and you cover it with drywall and sell it to a homeowner, that to me is a deceptive practice, at least evidence of one."

¶ 53        Defense counsel then argued that there was no evidence that defendant was aware that there was anything behind the walls and that there was no evidence to support an argument that the structural integrity of the building had been adversely affected by any debris behind the wall. The court asked defense counsel if there was any dispute that a " 'complete renovation' " would not include placing garbage and debris behind drywall and placing new drywall to hide it. Defense counsel agreed but again argued that there was no evidence that defendant was aware that the material was there. The trial court found that there was

evidence that had been presented that would defeat the motion for a directed finding and so denied it.

¶ 54    Defendant then put on her case-in-chief and called herself as the only witness. In addition to her earlier testimony during plaintiffs' case-in-chief, defendant testified to the extensive remodeling she completed on the property. Defendant also testified that she did not have any work done on the concrete floor in the basement, other than the repair of some hairline cracks, and that she was unaware that there was debris behind the walls in the basement. Defendant also denied making any false statements to plaintiffs.

¶ 55                        C. Trial Court Ruling

¶ 56    On May 21, 2018, the trial court set forth its findings of fact and conclusions of law in a 15-page order. The court first noted that it had the opportunity to observe and judge the credibility of the witnesses based both on their demeanor and on the substance of their testimony and found that "defendant was often not a credible witness."

¶ 57    As to its findings of fact, the trial court found that in November 2012, defendant purchased the subject property "to renovate and sell." Defendant had previously purchased two other properties for investment and sale and, after the sale of the subject property, subsequently purchased three additional properties for investment and sale. Defendant never resided at the subject property but resided at the Norridge address both before and after the purchase.

¶ 58    Prior to purchasing the subject property, defendant visited it twice. On the first visit, defendant was able to observe the existing drywall in the basement and the concrete basement floor but took no notes or photographs to depict its existing conditions. Defendant also made a second inspection during a final walkthrough. Defendant testified that she was

unable to observe the foundation because the basement was completely enclosed with drywall or plaster. Before purchasing the property, the seller informed defendant in a letter that there had been prior water infiltration. Defendant instructed her attorney to send a letter to the seller asking about the water infiltration, and the seller's attorney responded that a leak was observed three or four years ago in the unfinished basement area near the stairs but that it had not been observed by the seller since that time. The court found that defendant was aware of these communications. Defendant testified that the seller informed defendant that there was no basement leak but that the water infiltration was due to a roof leak that had been repaired. The trial court found this testimony "not credible, however, because the original seller's letter to defendant speaks of a basement leak separate and apart from the roof leak and does not connect the two." Defendant further testified that she did not hire a contractor to investigate any basement leak because she had only been informed of a repaired roof leak. Again, however, the trial court found that "the disclosure defendant received from the original seller contradicts her statement that she was told the roof leak and basement leak were related." Defendant testified that she did not observe any evidence of leaks in the roof or basement while she owned the property. Defendant also e-mailed the seller's attorney asking whether there were any problems or repairs made to the foundation and the seller's attorney responded that the seller had no knowledge or any current or past foundation defects and had no knowledge of any repairs made to the foundation in the past.

¶ 59    Defendant closed on the property in November 2012 and engaged contractors to perform construction work on the property. Defendant testified that she relied completely on Maliszewski and Midwest to define the scope of the work to be performed and to make decisions about construction at the property. Defendant had keys and access to the property

and made visits from time to time during the renovation. Defendant testified that the work on the property included:

"new roof, new windows, new gutters, new fence, extended stairs in front of the house, installed brick in front of the house, new deck, new siding, new garage door, every room in the interior painted, new carpet on the second floor, new tiles, hardwood floors installed on first floor, new interior doors, granite countertops, new cabinets, new ceiling fans, new water heater, replaced the furnace, air ducts replaced, new drywall, new carpet in the basement, upgrade[d] electrical, new plumbing fixtures such as faucets and sinks, replaced appliances such as refrigerator, stove, dishwasher, and oven hood, and basement remodel."

Defendant was also aware that drywall work was performed in the basement. Defendant additionally knew that concrete work was performed in the basement, including the removal and replacement of existing concrete. Defendant testified that she noticed hairline cracks in the concrete floor, which were repaired. Defendant testified that "she [was] not sure about the exact way the work was performed on the concrete basement floor, but she [knew] that it was fixed." Defendant also testified that the entire floor was not replaced. The trial court found "[d]efendant's testimony as to her unfamiliarity with the work performed in the basement after she purchased the Property was not credible."

¶ 60    Defendant produced lien waivers and invoices from several contractors, including an unsworn lien waiver from Midwest in the amount of $29,500, dated December 31, 2013, more than three weeks after plaintiffs closed on their purchase of the property. Defendant did not produce any checks or bank records corroborating this payment.

¶ 61    On October 28, 2013, defendant entered into a contract to sell the property to plaintiffs. Attached to the contract was a residential real property disclosure report, in which defendant represented that she was not aware of any material defects in the basement. The trial court found that "[d]efendant read the Residential Real Estate Property Disclosure prior to signing. Defendant was aware that in signing and delivering this document she was making representations regarding the condition of the Property. Defendant was aware that this information would be provided to plaintiffs who would rely upon the information contained in the disclosures." The court further found that "[b]efore executing the real estate contract, plaintiffs reviewed and relied upon the representations defendant made in the Residential Real Estate Property Disclosure Report."

¶ 62    The court found that, before the closing, "plaintiffs were aware of past evidence of moisture penetration and that the basement smelled of mildew and mold." On November 1, 2013, plaintiffs received a report from a home inspector they had retained. Adam had attended the inspection, and the property appeared as though it had been renovated. However, the inspector's report disclosed that the inspector found evidence of past or present moisture penetration in the basement, and during plaintiffs' inspection, they had noticed that the basement smelled like there had been previous water infiltration. On November 5, 2013, plaintiffs' attorney sent defendant a letter raising concerns from the inspection report, including moisture in the basement. Defendant's attorney responded that " 'Seller represents that there was not been any water penetration noticed by Seller since their [*sic*] purchase of the Property' " but did not disclose what the previous owner had said about a prior leak in the unfinished area of the basement. Defendant also did not advise plaintiffs about the roof leak disclosed by the previous owner because " 'that was four years before and they said they

22

never had the same problem again,' " and because she had the roof replaced. Plaintiffs testified that they relied upon defendant's representation as to water penetration.

¶ 63    In August 2015, plaintiffs engaged Walsten to inspect the property. Walsten took photographs and issued a report, documenting unconnected ground wires; outlets, switches, and live wires buried behind new drywall; water damage to the blue drywall; and construction debris behind the new drywall.

¶ 64    In September 2015, plaintiffs retained DAL to perform work in the basement. When DAL gutted the basement and demolished both the new drywall and the blue drywall, several hidden conditions and defects were exposed: (1) electrical outlets, switches, and live wires that had been buried behind drywall; (2) debris, consisting of dirt, drywall, construction materials, garbage, and broken concrete; (3) exposed live wire that was not grounded; (4) BX cable running through the entire basement; (5) that a structural support post for a structural beam was improperly resting on broken pieces of concrete instead of on adequate footings; (6) that the concrete thickness of the basement floor was substantially less than required; and (7) main plumbing lines were located at insufficient depth.

¶ 65    Larkin was the owner of DAL, which acted as a general contractor on residential construction projects. Larkin has worked in the construction industry for 30 years and began his own construction company in 1994 when he was 20 years old. Larkin testified that he was familiar with the City of Chicago building codes. Larkin was not an electrician or a structural engineer and did not hold licenses in those fields and had not completed any formal education or training in those areas. Larkin did not perform electrical work himself but contracted such work to a licensed electrician. On cross-examination, Larkin was unable to identify the section numbers in the City of Chicago building code for electrical work or any

code section numbers governing any work he did or planned to do; he also was unable to identify by number what section of the code defendant violated or any section of the code that was applicable. However, the trial court found Larkin "qualified to offer opinions on the construction issues arising in this lawsuit based on his training and long experience in the construction industry and as a general contractor. The court did not find that Larkin's inability to reference specific code section numbers from memory undermined his credibility or qualifications to offer expert opinions as a general contractor."

¶ 66        Larkin testified that code violations included (1) buried live electrical boxes, (2) exposed live wires, (3) live plumbing buried behind walls including buried shutoff valves, (4) inadequate footings for the support post, (5) improper thickness of concrete in which mechanicals and plumbing are buried, (6) failure to install a moisture barrier and substrate under concrete floor, and (7) improper use of BX flexible conduit for electrical wires. Larkin testified that burying live electric boxes is a fire hazard and that burying a water shutoff valve can cause flooding in the basement. Larkin also testified that placing the new drywall in front of existing drywall created areas in which moisture could be trapped and that the failure to remove the old drywall was not " 'consistent with good construction practices.' " Larkin further testified that he could observe that the concrete floor in the basement had been cut back to lower the floor and that, since there was no gravel substrate or waterproof membrane under the floor, this created a water infiltration issue; Larkin testified that the absence of gravel permitted water to be trapped under the floor, causing the floor to raise and crack, which caused water infiltration. Larkin testified that the debris behind the walls was not a building code violation but that it was "poor workmanship." The court found that, "[i]n

general, Larkin testified that the work performed by defendant in the basement was 'not good workmanship. A lot of corners were cut and it's multiple, multiple code violations.' "

¶ 67     DAL performed work to remediate the conditions in the basement, and the construction agreement and change orders were entered into evidence. The work performed by DAL was performed without permits, other than a plumbing permit. Larkin testified that "he could not obtain a permit because defendant never got a permit to perform the work he was now correcting." Plaintiffs paid various vendors a total of $67,833.57 relating to their claims against defendant, and DAL gave plaintiffs an estimate of $15,300 to redo the hardwood floor that was damaged by the refrigerator leak, as well as an estimate of $95,000 "to redo the concrete basement floor properly and remove the dirt and concrete pieces that remain in the basement."

¶ 68     After setting forth its findings of fact, the court then set forth its conclusions of law.[3] The court found that the Consumer Fraud Act applied to the transaction because "[d]efendant was in the business of buying, renovating, and selling residential real estate. She purchased the Property for this purpose. She never lived in the Property or intended to do so. Defendant was not, and never claimed to be, a private seller, selling her own residence." Thus, the court found that "[t]he unfair and deceptive practices described below occurred in the conduct of trade or commerce" within the meaning of the Consumer Fraud Act.

¶ 69     The court found that, at the time defendant sold the property to plaintiffs, it contained serious defects and deficiencies, including (1) water-damaged drywall hidden behind new

---

[3]In this section, the trial court made several preliminary rulings on issues it had reserved. One of these provided that "Plaintiffs' motion for leave to file an amended complaint to conform to the proof[s] is granted." No such motion appears in the record, and no file-stamped copy of an amended complaint appears in the record on appeal. There is an amended complaint contained in the supplemental record, but it does not bear a file stamp. In their brief, plaintiffs admit that they never filed the amended complaint but claim that it only provided additional factual detail to support the already-pled allegations contained in the earlier complaint.

drywall installed by defendant's contractor; (2) live electrical wiring and components, plumbing, garbage, and construction debris hidden behind the new drywall; (3) inadequate concrete slab in the basement hidden by carpet; and (4) an improperly supported structural post in the basement hidden by newly installed drywall. The court found that these conditions would have been apparent during the renovation performed by defendant and that "defendant knew of these conditions, but even if she did not, her contractor knew of them, and her ignorance of these conditions could only have been willful."

¶ 70 The court further found that defendant was charged with Midwest's knowledge, specifically finding:

> "Defendant did not have an arm's length relationship with Midwest. As noted above, Midwest's owner resides in the same home with defendant; there was no evidence of any contract between defendant and Midwest; according to defendant, she relied completely on Midwest to define the scope of work to be performed and to decide construction issues; and defendant's testimony that she paid Midwest was not corroborated by checks or bank records that should have been readily available. Under these circumstances, defendant cannot claim ignorance of conditions that were known to Midwest. Moreover, generally, the knowledge and conduct of an agent is imputed to its principal. [Citation.]"

¶ 71 The court found that all of the conditions were hidden from plaintiffs behind newly constructed and newly painted drywall or a newly carpeted surface and found that "the concealment was deliberate and done with the intent to hide conditions from potential buyers including plaintiffs." The court further found "defendant's concealment of the condition of the structural post in the basement to be particularly egregious and directly probative of

intent. This condition is obviously inadequate, and the decision to hide it rather than remediate it has no innocent explanation." The court found that none of the defects were apparent to plaintiffs and could not have been discovered without destructive testing.

¶ 72     The court found that defendant had committed fraud by (1) affirmatively representing that she was unaware of material defects in the basement or foundation on the residential real property disclosure form appended to the purchase contract and (2) deliberately concealing defective conditions behind newly constructed drywall. However, the court found that "[d]efendant's representation of the Property as a 'complete renovation' under these circumstances is further evidence of fraud but is not necessary to the court's finding." The court also found that, for the same reasons as in the common-law fraud count, defendant's conduct was an unfair and deceptive practice in the conduct of trade or commerce within the meaning of the Consumer Fraud Act.

¶ 73     However, the court found that plaintiffs had not proven fraud in connection with defendant's representations as to water entry in the basement. The court found that plaintiffs were aware of, and inquired about, past evidence of moisture penetration into the basement. Defendant responded that she had not noticed any water penetration since she purchased the property, and the court found no evidence that this was untrue. The court found that, while defendant did not disclose the report she received from the previous owner concerning water damage, plaintiffs' preclosing inquiry established that they knew of evidence of past water intrusion, and accordingly, the court did not find this to be either a material omission or that defendant intended to mislead.

¶ 74     Finally, the court found that, as to plaintiffs' complaints about the " 'top of the line' " appliances, it had no need to determine whether defendant committed fraud or violated the

Consumer Fraud Act because plaintiffs had not proven that the damages they suffered were proximately caused by any misrepresentation.

¶ 75     As to damages, the court found that the work performed by DAL was reasonable and necessary to correct defective conditions in the basement that were concealed by defendant's fraud and violations of the Consumer Fraud Act and found that plaintiffs were entitled to recover $56,269.50 for the cost of that work. The court further found that additional remediation of the basement floor and water piping and removal of debris was also reasonable and necessary to correct the defects and awarded $91,850 for that work, subtracting $3150 for repair of a post from DAL's $95,000 estimate because that work had already been performed and was therefore included in the other damages award. The court declined to award damages for work related to water entry, finding that such work was unrelated to any actionable conduct, and also declined to award damages for repairs based on the failure of the appliances for the same reason. Finally, the court found that "plaintiffs [were] entitled to recover their attorneys' fees and litigation expenses under the Consumer Fraud Act and as punitive damages for fraud" and granted them leave to file a fee petition.

¶ 76     In a separate order, the trial court admitted Larkin's opinion, finding that Larkin was an independent expert witness under Illinois Supreme Court Rule 213(f)(2) (eff. Jan. 1, 2007), and that plaintiffs had sufficiently disclosed his identity, the subject matter of his testimony, and his opinions. The court found that, within the deadline set by the court, plaintiffs had identified Larkin as a Rule 213(f)(2) witness, disclosed the subject matter of his testimony, and had disclosed some of his opinions through plaintiffs' deposition testimony and document production. The court found that, "[c]learly," plaintiffs anticipated additional disclosure through Larkin's deposition but that the deposition never occurred because

"defense counsel was intent on obstructing the deposition." At that point, although it was past the court's deadline, plaintiffs provided supplemental Rule 213(f)(2) responses disclosing Larkin's opinions more thoroughly, and defense counsel had adequate time to depose Larkin prior to trial. The court found that, "[f]rom the totality of the circumstance, *** defense counsel was not surprised by the supplemental disclosure, nor was he ever concerned about prejudice from a 'late' disclosure. Instead, defense counsel's objective and his actions were solely directed toward preventing relevant and competent evidence from being introduced at trial." The court noted that it was not condoning the failure of plaintiffs' counsel to disclose Larkin's opinions within the court's timeline. However, the court found:

> "Nevertheless, here there was some disclosure before the deadline, and there was not full disclosure by way of deposition only because of defense counsel's refusal to cooperate. There was adequate supplemental disclosure well before trial and in sufficient time for defendant to conduct any necessary discovery more than 60 days before trial. There was no prejudice or surprise to defendant, and, instead of taking the witnesses [*sic*] deposition or seeking relief from the court, defendant reacted by attempting to coerce the witness into not testifying. Under these circumstances, and considering all of the *Boatmen's* factors [(*Boatmen's National Bank of Belleville v. Martin*, 155 Ill. 2d 305, 314 (1993))], defendant's objections to Larkin's opinion testimony based on Rule 213(f)(2) violations are denied and the evidence is admitted."

¶ 77     On June 18, 2018, plaintiffs filed a petition for attorney fees, seeking $59,991.51 in attorney fees and $8453.28 in court costs. On October 19, 2018, the trial court entered an order, finding that the attorney fees and costs requested by plaintiffs' counsel were

reasonable and awarding those fees and costs to plaintiffs. Additionally, and in the alternative, the court found that "a punitive damage award of $68,444.79 is reasonable in light of the conduct involved, the actual damages awarded, and the potential for structural damage to the dwelling." Accordingly, the trial court awarded plaintiff $68,444.79 for attorney fees and costs under the Consumer Fraud Act and as punitive damages and entered judgment in plaintiffs' favor and against defendant in the total amount of $216,564.29.

¶ 78    Defendant timely filed a notice of appeal, and this appeal follows.

¶ 79                                    ANALYSIS

¶ 80    On appeal, defendant raises several issues, including that (1) the trial court's findings were against the manifest weight of the evidence, (2) the trial court erred in finding the Consumer Fraud Act applicable, (3) the trial court erred in admitting Larkin's testimony, and (4) the trial court erred in awarding attorney fees and costs. We consider each argument in turn but first consider the issue concerning the admission of Larkin's testimony because this testimony was relied on by the trial court in its findings.

¶ 81                      I. Admission of Larkin's Testimony

¶ 82    Defendant claims that the trial court erred in admitting Larkin's testimony because Larkin was not properly disclosed as an expert witness. The trial court has discretion over the conduct of discovery, and its decision will not be overturned absent an abuse of that discretion. *Ragan v. Columbia Mutual Insurance Co.*, 183 Ill. 2d 342, 352 (1998); see also *People v. Williams*, 209 Ill. 2d 227, 234 (2004) ("we review the circuit court's decisions regarding discovery for abuse of discretion"). " 'Abuse of discretion' is the most deferential standard of review—next to no review at all—and is therefore traditionally reserved for decisions made by a trial judge in overseeing his or her courtroom or in maintaining the

progress of a trial." *In re D.T.*, 212 Ill. 2d 347, 356 (2004). A trial court abuses its discretion only when "no reasonable person would take the view adopted by the trial court." *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177 (2003).

¶ 83    In the case at bar, defendant sought to bar Larkin's opinion prior to trial because she claimed that he was not timely disclosed as an expert witness. The trial court found that Larkin was properly disclosed as a Rule 213(f)(2) independent expert witness. Such a witness is "a person giving expert testimony who is not the party, the party's current employee, or the party's retained expert." Ill. S. Ct. R. 213(f)(2) (eff. Jan. 1, 2007). For an independent expert witness,

> "the party must identify the subjects on which the witness will testify and the opinions the party expects to elicit. An answer is sufficient if it gives reasonable notice of the testimony, taking into account the limitations on the party's knowledge of the facts known by and opinions held by the witness." Ill. S. Ct. R. 213(f)(2) (eff. Jan. 1, 2007).

He or she need not be a witness who agreed to be an expert.

¶ 84    Plaintiffs first disclosed representatives of DAL as "person[s] with knowledge of the allegations in Plaintiff's Complaint" on March 7, 2017. In the same disclosure, when asked to identify each Rule 213(f) witness, plaintiffs disclosed as potential Rule 213(f)(1) lay witnesses:

> "*Representatives of DAL Builders, Inc., to be identified* will testify as to their employment by and relationship with DAL Builders, Inc., their background, education, experience and training in the construction industry, the scope of work performed by DAL Builders, Inc. at the plaintiffs' residence, their observations of the

31

general condition of the premises, including code violations as well as the scope of the construction activities and completed work at plaintiffs' residence, they will testify as to communications with plaintiffs, and with any third parties, they will testify consistent with the records kept and maintained by DAL Builders, Inc. in the ordinary and regular course of business pertaining to its work at the plaintiffs' residence. They will testify consistent with their depositions yet to be taken." (Emphasis in original.)

The disclosure also provided that DAL representatives also "may be considered expert witnesses consistent with" Rule 213(f)(2) and/or Rule 213(f)(3).

¶ 85    Plaintiffs also testified in their depositions concerning the observations and opinions that DAL communicated to them, including the specific defects observed, that these defects would have been obvious before defendant did her renovation, and the estimates for future work that needed to be performed. Plaintiffs also produced the estimates, contracts, invoices, and change orders for the work that DAL performed.

¶ 86    On August 3, 2017, in an e-mail, plaintiffs' counsel informed defendant's counsel that "relative to the DAL representatives who were generally identified in the original 213 disclosures and discussed during [plaintiffs'] depositions, it is anticipated that Tim Larkin and also perhaps David Larkin will testify as to the work DAL performed and the observations that were made." In late August and early September, plaintiffs' counsel attempted to schedule Larkin's deposition, but defendant's counsel refused to appear for the deposition because he claimed that Larkin had not produced his documents; the trial court found that plaintiffs, in fact, had provided defense counsel with a Dropbox link to the

documents and had separately forwarded e-mail communications between counsel and Larkin.

¶ 87         On September 14, 2017, after the trial court's September 3 cutoff date but more than 90 days before trial, plaintiffs served defendant with supplemental Rule 213 disclosures, in which plaintiffs stated that Larkin, "previously disclosed as a witness," was additionally "expected to testify to the following defects and code violations":

> "1. New basement walls having been constructed in front of existing (old) walls.
>
> 2. The pre-existing 'old' walls had clear evidence of water damage and staining.
>
> 3. Debris and garbage was stuffed between the old and new walls.
>
> 4. Buried live electrical connections in the old wall, which created a fire hazard.
>
> 5. Improper grounding of the water service.
>
> 6. Improperly wired switches.
>
> 7. Improper use of BX in electrical wiring.
>
> 8. Improper excavation of the old concrete floor and pouring of a new concrete floor directly onto clay. The excavation of the old floor was not sufficiently deep and there was a failure to properly prepare the base with gravel and rebar. The existing water and sewer lines were not replaced and buried within the new floor. The result was that the 'new' concrete floor heaved and cracked.
>
> 9. The posts supporting the basement ceiling were not properly secured in the concrete. No piers were constructed. When the old basement floor was excavated, the existing area which surrounded the post was left with the new floor poured around. The existing concrete 'supporting' the posts was crumbling, causing a structural issue.

10. Concrete and debris from the basement demolition and excavation was found buried in the crawl space."

The supplemental disclosure also provided that "Mr. Larkin is further expected to testify consistent with the notes taken during the project, previously identified as Exhibit 6 and discussed during plaintiffs' depositions."

¶ 88    The next day, on September 15, defense counsel sent Larkin an e-mail threatening to report Larkin to the City of Chicago for performing work without proper permits unless "DAL tells me in writing that they will withdraw any and all testimony in this case" in which case "the matter will be dropped." Larkin also testified at trial that defense counsel also pressured him into signing the "certification" stating that Larkin had no opinions on the work performed.

¶ 89    We cannot find that it was an abuse of discretion for the trial court to find that Larkin's opinions were properly disclosed. "Barring an opinion witness's testimony *in toto* *** is a drastic sanction and should be exercised with caution." *McGovern v. Kaneshiro*, 337 Ill. App. 3d 24, 37 (2003). In determining whether such a sanction is appropriate, the trial court should look to factors such as the surprise to the adverse party, the prejudicial effect of the testimony, the nature of the testimony, the diligence of the adverse party, whether there was a timely objection to the testimony, and the good faith of the party calling the witness. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 110 (2004). Here, the trial court found that, prior to the discovery cutoff date, Larkin had been identified as a Rule 213(f)(2) witness, the subject matter of his testimony had been disclosed, and some of his opinions had been disclosed through plaintiffs' deposition testimony and document production. The court further found that plaintiffs "[c]learly" anticipated further disclosure through Larkin's deposition but

defense counsel refused to cooperate in arranging the deposition, leading plaintiffs to supplement their Rule 213(f)(2) responses "[w]hen it became clear to plaintiffs' counsel that defense counsel was intent on obstructing the deposition." While this supplemental disclosure was outside the court's deadline, it was more than 60 days prior to trial and left sufficient time to take Larkin's deposition more than 60 days before trial. In the case at bar, we cannot find that the trial court abused its discretion in denying defendant's request to bar Larkin's testimony, especially in light of defense counsel's involvement in the matter.

¶ 90       Defendant also claims that the trial court abused its discretion in permitting Larkin's testimony because he was not qualified to present expert testimony. Defendant did not raise this issue before the trial court, where his motion to bar Larkin's testimony was based solely on the timeliness of the disclosure. Accordingly, defendant has forfeited this argument on appeal. See *In re Marriage of Blinderman*, 283 Ill. App. 3d 26, 31 (1996) ("Failure to object to an expert's qualifications results in a waiver on appeal."). Furthermore, "[e]xpert testimony is admissible if the proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence." *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003). In the case at bar, Larkin testified as to his qualifications, including over 30 years in the construction business and extensive experience with similar projects. We cannot find that the trial court abused its discretion in finding Larkin to be qualified to opine as to the quality of the work in the present case.

¶ 91                                II. Common-Law Fraud

¶ 92       We next consider defendant's claim that the trial court erred in finding that she was liable for common-law fraud. In a bench trial, as occurred in the instant case, the trial court has the opportunity to weigh the evidence and make findings of fact, and a reviewing court will defer

to the findings of the trial court unless they are against the manifest weight of the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner*, 202 Ill. 2d at 252. "A reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the fact finder." *Bazydlo v. Volant*, 164 Ill. 2d 207, 214 (1995). " 'The court on review must not substitute its judgment for that of the trier of fact.' " *Eychaner*, 202 Ill. 2d at 252 (quoting *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 434 (1991)).

¶ 93    As an initial matter, defendant makes an argument challenging the trial court's grant of a motion for leave to file an amended complaint to conform the pleadings to the proof. As noted, no such motion appears in the record on appeal, and the amended complaint was never actually filed. Accordingly, we consider the originally filed complaint when addressing any issues concerning the pleadings. We must note, however, that defendant claims that the amended complaint added allegations concerning fraudulent concealment and deceptive practices that were not included in the original complaint. However, the original complaint did include allegations concerning both—the fact that the defects were hidden was a major part of plaintiffs' complaint and was not a surprise to defendant, as she claims in her brief. Thus, we do not agree with defendant that the amended complaint raised causes of action that were not previously included in the original complaint or that the trial court somehow " 'coach[ed]' " plaintiffs to include those allegations through its comments.

¶ 94    We turn, then, to consideration of defendant's arguments concerning the trial court's finding of fraud.

36

"In order to recover for common-law fraud, a plaintiff is required to prove that (1) the defendant made a false statement of material fact, (2) the defendant knew that the statement was false, (3) the defendant intended to induce the plaintiff to act in reliance upon the statement, (4) the plaintiff reasonably relied upon the truth of the statement, and (5) the plaintiff suffered damage as a result of action in reliance upon the statement." *Kroot v. Chan*, 2017 IL App (1st) 162315, ¶ 33 (citing *Board of Education of the City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 452 (1989)).

¶ 95    Additionally, "[i]ntentional concealment of a material fact is the equivalent of a false statement of material fact. [Citation.] Where a person has a duty to speak, his failure to disclose material information constitutes fraudulent concealment. [Citation.]" *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill. App. 3d 154, 161 (1986).

"To prove that a concealment constituted a fraudulent misrepresentation, the plaintiff must show: (1) the defendant concealed a material fact; (2) the concealment was intended to induce a false belief; (3) the plaintiff could not have discovered the truth through a reasonable inquiry or inspection and relied upon the silence as a representation that the fact did not exist; (4) the concealed information was such that the plaintiff would have acted differently if he had been aware of it; and (5) the reliance by the plaintiff led to his injury." *D'Attomo v. Baumbeck*, 2015 IL App (2d) 140865, ¶ 61 (citing *Lane v. Anderson*, 345 Ill. App. 3d 256, 263 (2004)).

Regardless of whether the alleged fraud is based on an affirmative misrepresentation or on fraudulent concealment, fraud must be proven by clear and convincing evidence. See *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 191 (2005); *Benson v.*

*Stafford*, 407 Ill. App. 3d 902, 918 (2010) (noting that fraudulent concealment must be proven by clear and convincing evidence).

¶ 96    In the case at bar, the trial court found that defendant had committed fraud in two ways: by (1) affirmatively representing that she was unaware of material defects in the basement or foundation on the residential real property disclosure form appended to the purchase contract and (2) deliberately concealing defective conditions behind newly constructed drywall. We note that defendant spends several pages of her brief arguing that the description of the property as a "complete renovation" was not a false statement of material fact; however, the trial court made clear that "[d]efendant's representation of the Property as a 'complete renovation' under these circumstances is further evidence of fraud but is not necessary to the court's finding." Consequently, while this description may add to the analysis of defendant's intent, it is important to note that this statement was not one that the trial court found constituted a fraudulent representation itself.

¶ 97    With respect to the two instances of fraud identified by the trial court, defendant first argues that she did not have knowledge of any defects on the property and that she should not be charged with Midwest's knowledge. We do not find this argument persuasive. First, the trial court expressly found that defendant had knowledge of the defective conditions present in the basement, finding that such defects would have been apparent during the renovation, and this finding is supported by the evidence presented at trial. Defendant specifically testified that she "[did] know that drywall work was involved in the basement." Additionally, during his testimony, Larkin opined that if defendant was the one responsible for the walls, "it would be impossible not to know" of the debris behind the walls. The trial court also expressly found that "[d]efendant's testimony as to her unfamiliarity with the work

38

performed in the basement after she purchased the Property was not credible." As noted, "[t]he trial judge, as the trier of fact, is in a position superior to the reviewing court to observe witnesses while testifying, to judge their credibility, and to determine the weight their testimony should receive." *Bazydlo*, 164 Ill. 2d at 214-15. We will not substitute our judgment for the trial court's on the issue of defendant's credibility on this subject. See *Eychaner*, 202 Ill. 2d at 252.

¶ 98    Additionally, the trial court found that Midwest's knowledge should be imputed to defendant, in part, because Midwest was defendant's agent. Generally, the knowledge and conduct of agents are imputed to their principals. *McRaith v. BDO Seidman, LLP*, 391 Ill. App. 3d 565, 589 (2009). "[T]he question of whether an agency relationship exists and the scope of the purported agent's authority are questions of fact." *Kaporovskiy v. Grecian Delight Foods, Inc.*, 338 Ill. App. 3d 206, 210 (2003). Here, we cannot find that the trial court's finding that there was an agency relationship between defendant and Midwest was against the manifest weight of the evidence.

¶ 99    The trial court found that defendant and Midwest did not have an arm's-length relationship. Defendant resided in the same home as Maliszewski, the owner of Midwest, both before and after the purchase of the subject property. Maliszewski was intimately involved in the renovation of the property, even visiting the property prior to defendant's making an offer to purchase it. Defendant also claimed that she relied entirely on Maliszewski to define the scope of the work because she did not have the knowledge to decide what should be repaired. However, there was no evidence of any contract between defendant and Midwest, and there was no evidence corroborating defendant's claim that she paid Midwest for its work. Given the fact that defendant and Midwest were so intertwined,

we cannot find that the trial court's finding that Midwest was acting as defendant's agent to be against the manifest weight of the evidence.

¶ 100    Defendant argues that Midwest was an independent contractor, not an agent, and so defendant cannot be charged with Midwest's knowledge. "The hallmark of agency is the principal's right to control the manner in which the agent performs the work. [Citation.] By contrast, an independent contractor undertakes to produce a given result but is not controlled with regard to how that result is achieved. [Citation.]" (Internal quotation marks omitted.) *Magnini v. Centegra Health System*, 2015 IL App (1st) 133451, ¶ 25. " '[T]he cardinal consideration is whether that person retains the right to control the manner of doing the work.' " *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 44 (quoting *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 46 (1999)).

¶ 101    In the case at bar, defendant claims that she had no control over Midwest and that Midwest was permitted to make all decisions on its own. However, defendant's argument does not account for the trial court's finding that she and Midwest did not have an arm's-length relationship. Defendant attempts to dismiss the fact that she and Maliszewksi resided together as a "red herring" and "not probative of whether there was a principal-agent or independent contractor relationship." Defendant, however, also overlooks other facts—such as the fact that there was no contract between Midwest and defendant and the fact that there was no corroboration of defendant's claim that she paid Midwest for its work. Moreover, defendant's ability to characterize facts in a different way than the trial court does not mean that the trial court's findings of fact may be ignored, even if we agreed with defendant. As noted, "[a] reviewing court should not overturn a trial court's findings merely because it does

not agree with the lower court or because it might have reached a different conclusion had it been the fact finder." *Bazydlo*, 164 Ill. 2d at 214.

¶ 102     Additionally, defendant's argument conflates the *right* to control a party's work with the *exercise* of that right. Defendant testified that she relied on Midwest to determine the scope of the renovations because she did not have the knowledge to know what repairs needed to be made. However, defendant also testified that she visited the property while renovations were being performed and also pointed out areas that needed to be fixed, such as hairline cracks on the concrete floor. The fact that defendant chose to accept Midwest's recommendations as to the scope of the work did not mean that she did not have the right to control that work when she chose to do so.

¶ 103     Finally, defendant claims that plaintiffs did not specifically plead facts concerning an agency relationship in their complaint. Defendant relies on *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 498 (1996), in which our supreme court held that "[a] complaint relying on agency must plead facts which, if proved, could establish the existence of an agency relationship." However, that case is inapplicable to the case at bar. There, the alleged agent's comments constituted the fraudulent misrepresentations serving as the basis of the plaintiffs' fraud claim. *Connick*, 174 Ill. 2d at 497. Thus, in order to hold the defendant liable for the comments, the plaintiffs were required to plead and prove that the comments were made by the defendant's agents. *Connick*, 174 Ill. 2d at 499. By contrast, in the case at bar, it is defendant's own representations and concealment that are at issue; plaintiffs are not seeking to hold defendant vicariously liable for someone else's actions. The only area in which agency becomes relevant is in determining whether Midwest's knowledge can be imputed to defendant. In other words, the question is not whether defendant can be liable for what

Midwest did or said; instead, the question is whether defendant knew what Midwest did. The complaint alleges that defendant had "actual or presumed knowledge of the conditions or defects" alleged in the complaint, which "arose directly from defendant's ownership of the property, as well as participation in the renovation and subsequent marketing for sale to the members of the general public, including [plaintiffs]." These allegations are sufficient to plead defendant's knowledge, despite their lack of reference to Midwest, and we find defendant's argument otherwise to be unpersuasive. Accordingly, we do not find the trial court's findings concerning defendant's knowledge of the defects to be against the manifest weight of the evidence.

¶ 104    We similarly find unpersuasive defendant's claims that Midwest was not aware of the defects in the basement. First, this again overlooks the trial court's express finding that defendant was personally aware of the defects in the basement. Additionally, the trial court also expressly found that the defective conditions would have been apparent during the renovation of the basement and that "[Midwest] knew of them." Defendant testified as to the extensive renovations performed throughout the house, including in the basement, and testified that Midwest was responsible for determining the scope of the work needed. Defendant also specifically testified that drywall work was performed in the basement, as well as repairs of the concrete floor. It was not against the manifest weight of the evidence for the trial court to find that Midwest was aware of the defects in light of its extensive involvement in the renovation of the property.

¶ 105    Defendant also challenges the trial court's finding that she was liable for fraud because she claims that plaintiffs' reliance on the allegedly false statements or concealments was not reasonable. As part of its fraud claim, a plaintiff must show that its reliance on the

42

misrepresentation was justified. *Adler v. William Blair & Co.*, 271 Ill. App. 3d 117, 125 (1995). In other words, the reliance must be reasonable. See *In re Marriage of Broday*, 256 Ill. App. 3d 699, 703 (1993). Generally, the question of whether a plaintiff's reliance was reasonable is a question of fact; however, where only one conclusion can be drawn from the undisputed facts, the question becomes one for the court to determine. *Doe v. Dilling*, 371 Ill. App. 3d 151, 174 (2006) (citing *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 295 Ill. App. 3d 567, 575 (1998)). "In determining whether reliance was justifiable, all of the facts which the plaintiff knew, as well as those facts the plaintiff could have learned through the exercise of ordinary prudence, are taken into account." *Adler*, 271 Ill. App. 3d at 125. " '[A] person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another.' " *D.S.A. Finance Corp. v. County of Cook*, 345 Ill. App. 3d 554, 561 (2003) (quoting *Chicago Export Packing Co. v. Teledyne Industries, Inc.*, 207 Ill. App. 3d 659, 663 (1990)). However, " 'Illinois law has long held that, where the representation is made as to a fact actually or presumptively within the speaker's knowledge, and contains nothing so improbable as to cause doubt of its truth, the hearer may rely upon it without investigation, even though the means of investigation were within the reach of the injured party and the parties occupied adversary positions toward one another.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 709 (2002) (quoting *Sims v. Tezak*, 296 Ill. App. 3d 503, 511 (1998)). "If the party's reliance is unreasonable in light of the information open to him, the loss is considered his own responsibility." *D.S.A. Finance*, 345 Ill. App. 3d at 561 (citing *Neptuno*, 295 Ill. App. 3d at 575).

¶ 106　　In the case at bar, defendant makes a series of arguments that she claims leads to the conclusion that plaintiffs did not reasonably rely on her representations or omissions—she claims that (1) the basement repairs were performed without permits; (2) had permits been obtained, the work would have been up to code and there would have been no defects; (3) plaintiffs had the opportunity to discover that the work was performed without permits; and (4) since plaintiffs should have known the work was performed without permits, they had an obligation to inquire further into the quality of the work or to pull out of the deal. Even if we accepted defendant's series of assumptions, we do not find this argument persuasive. Defendant has provided no authority suggesting that a purchaser is required to pull permits when seeking to purchase a home in order to investigate whether a seller has performed renovations properly. As noted, " 'Illinois law has long held that, where the representation is made as to a fact actually or presumptively within the speaker's knowledge, and contains nothing so improbable as to cause doubt of its truth, the hearer may rely upon it without investigation, even though the means of investigation were within the reach of the injured party and the parties occupied adversary positions toward one another.' " *Schrager*, 328 Ill. App. 3d at 709 (quoting *Sims*, 296 Ill. App. 3d at 511). Here, defendant's representation as to the lack of material defects was not so improbable as to cause doubt of its truth, and so there is nothing suggesting that plaintiffs were required to pull the permits on the renovation work themselves.

¶ 107　　Defendant points to two "disclaimers" instructing plaintiffs to perform their own investigations, which she claims should have flagged the issue for plaintiffs. First, the listing sheet contained a disclaimer at the bottom stating that "[t]he accuracy of all information, regardless of source, including but not limited to square footages and lot sizes, is deemed

reliable but nor guaranteed and should be personally verified through personal inspection by and/or with the appropriate professionals." Second, the residential real estate property disclosure form contained a statement in all-caps providing, in relevant part, that "[t]his disclosure is not a substitute for any inspections or warranties that the prospective buyer or seller may wish to obtain or negotiate. The fact that the seller is not aware of a particular condition or problem is no guarantee that it does not exist. Prospective buyer is aware that he may request an inspection of the premises performed by a qualified professional." We do not find that either of these "disclaimers" would have led plaintiffs to believe they needed to pull their own permits or that the work was performed improperly. Both suggest obtaining an inspection of the property, which plaintiffs did. However, as Walsten testified, the standards for a home inspection provided for a visual inspection and did not permit any destructive testing. Thus, even with an inspection by a qualified professional, plaintiffs would not have discovered any issues hiding behind the drywall or under the concrete.

¶ 108    Defendant also claims that the home inspector " 'highly recommended' " that plaintiffs verify that permits were pulled and that, when plaintiffs contacted defendant's attorney on the issue, the attorney crossed out plaintiffs' request that defendant certify that all permits were obtained and instead provided a response stating that " 'Seller believes that it pulled the required permits with final inspections being performed; Buyer should rely on its own due diligence. Seller does represent that work drawings were performed by an architect; the architect also pulled the permits. Rough and final inspections passed.' " This argument, however, was never presented to the trial court. More specifically, defendant never made any argument that the lack of permits should have been discovered by plaintiffs or that plaintiffs' reliance was unreasonable because they failed to pull permits. Plaintiffs were also never

asked about this portion of the inspector's report or about this portion of the attorney's response during trial. We will not find a trial court's factual finding to be against the manifest weight of the evidence based on an argument that was never raised before the trial court and which the parties never had the opportunity to address. Moreover, even if plaintiffs should have investigated further as to the permits, a defendant's liability for an intentional tort such as fraud generally cannot be defeated by an assertion of plaintiffs' negligence once plaintiffs show they had a right to rely on the misrepresentations. See *Zimmerman*, 156 Ill. App. 3d at 166-67. Accordingly, we cannot find that the trial court's finding that plaintiffs reasonably relied on defendant's statements in the residential real estate property disclosure form was against the manifest weight of the evidence, nor can we find that it was against the manifest weight of the evidence for the trial court to find that plaintiffs reasonably relied on defendant's silence in the face of the concealment of the defects.

¶ 109    Finally, defendant challenges the award of damages, arguing that it included amounts that were not recoverable. As with the trial court's other findings, we review a trial court's damages award under the manifest weight of the evidence standard. *Union Tank Car Co. v. NuDevco Partners Holdings, LLC*, 2019 IL App (1st) 172858, ¶ 26. With respect to the $56,269.50 awarded for the work that had already been performed, defendant claims that this amount includes the cost of repairing defects that were found not to be actionable as well as for upgrades. We do not find this argument persuasive.

¶ 110    Defendant claims that the damages award includes upgrades, such as the installation of a bar. However, plaintiff Jennifer Pack, who testified extensively about the damages, testified that plaintiffs purchased the components of the bar and those amounts were not included in the compensation that they were seeking. Plaintiffs also provided numerous invoices, which

46

were admitted into evidence, detailing the work for which they were seeking compensation. Additionally, defendant suggests that the damages award included amounts incurred as a result of the water damage. However, Jennifer testified that amounts for water remediation were not included in the damages they were seeking and that a payment from the insurance company was used for those expenses. Finally, defendant suggests that plaintiffs are not entitled to any damages because DAL's work was performed without permits and, therefore, the quality of the work could not be assured. However, Larkin testified that the reason that DAL did not obtain permits was because Midwest had not obtained permits for the original work and "it's impossible for me as a contractor *** to go get a permit to fix work that never should have been done in the first place." Thus, denying plaintiffs an award based on the lack of permits would be, in effect, doubly penalizing them for defendant's fraudulent conduct. Given the testimony concerning plaintiffs' damages, as well as the paid invoices provided by plaintiffs, we cannot find that the trial court's damages award for the damages already incurred by plaintiffs was against the manifest weight of the evidence.

¶ 111    Defendant also argues that the $91,850 awarded for additional remediation was against the manifest weight of the evidence because there was no evidence that plaintiffs had suffered damages in that amount. We do not find this argument persuasive. Plaintiffs obtained the estimate from DAL for work to repair the remaining defects in the basement; Jennifer testified that they were unable to afford to make all the repairs at once, so they chose to spend their limited funds on the most necessary repairs first. This does not render the remainder of the repairs unnecessary, however, as defendant argues. The trial court heard testimony and reviewed the invoices detailing the remainder of the necessary work, such as properly laying the concrete floor. Indeed, the trial court even refused to award damages in

the entire amount of the estimate, finding that some of the repairs had already been completed, demonstrating that it was closely considering the expenses. We cannot find that its determination that these additional expenses were properly awarded as damages to be against the manifest weight of the evidence. Accordingly, we affirm the trial court's finding that defendant was liable for common-law fraud in its entirety.

¶ 112                                    III. Consumer Fraud Act

¶ 113        Next, defendant claims the trial court erred in finding that she was liable under the Consumer Fraud Act. Section 2 of the Consumer Fraud Act provides that

> "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, *** in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2 (West 2016).

To succeed in a private cause of action under the Consumer Fraud Act, a plaintiff must prove '(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception.' " *Avery*, 216 Ill. 2d at 190-91 (quoting *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 149 (2002)). A plaintiff must prove a claim under the Consumer Fraud Act by a preponderance of the evidence (*Avery*, 216 Ill. 2d at 192), and the trial court's determination

as to whether the plaintiff has proven all the elements of the claim is reviewed under the manifest weight of the evidence standard of review (*Avery*, 216 Ill. 2d at 191).

¶ 114       In the case at bar, defendant's primary argument is that her conduct did not fall under the Consumer Fraud Act as a matter of law because the Consumer Fraud Act does not apply to "casual sales of single-family homes between individuals." The interpretation of a statute is a question of law, which we review *de novo*. *Yang v. City of Chicago*, 195 Ill. 2d 96, 103 (2001). *De novo* consideration means we perform the same analysis that a trial court would perform. *People v. McDonald*, 2016 IL 118882, ¶ 32.

¶ 115       Defendant's argument is based on the case of *Zimmerman*, 156 Ill. App. 3d 154. In that case, the plaintiffs purchased a single-family residence from the former homeowners and later discovered that the lot size was smaller than advertised and that the property had numerous defects. *Zimmerman*, 156 Ill. App. 3d at 158. The plaintiffs filed a complaint alleging several causes of action, including one for violation of the Consumer Fraud Act. The trial court dismissed the count concerning the Consumer Fraud Act, and the appellate court affirmed the dismissal. On appeal, the court noted that the complaint alleged that the sellers were conducting the trade or commerce of selling real estate but found that "[w]e find no support in Illinois law for the proposition that an individual selling his own home is liable to a purchaser under the Consumer Fraud Act." *Zimmerman*, 156 Ill. App. 3d at 168. The court noted that the Consumer Fraud Act had been applied to a seller of commercial real estate, but that case differed from the case at bar, "which involves only two individuals and a casual sale of a single-family home." *Zimmerman*, 156 Ill. App. 3d at 168-69. Accordingly, the court "decline[d] to extend the scope of the Consumer Fraud Act to individual sellers of single-family dwellings." *Zimmerman*, 156 Ill. App. 3d at 169.

¶ 116    Several courts have followed the *Zimmerman* court's lead and have similarly found that the Consumer Fraud Act does not apply to an individual sale of a single-family residence between a private seller and a private buyer. See, *e.g.*, *Anderson v. Stowell*, 183 Ill. App. 3d 862, 864 (1989); *Strauss v. Cruz*, 259 Ill. App. 3d 608, 610 (1994);[4] *Eickmeyer v. Blietz Organization, Inc.*, 284 Ill. App. 3d 134, 144 (1996); *Carrera v. Smith*, 305 Ill. App. 3d 1079, 1082 (1999). However, in *Kleczek v. Jorgensen*, 328 Ill. App. 3d 1012, 1019-20 (2002), the court found that the Consumer Fraud Act may apply when the seller is in the business of building and selling houses. There, the defendants purchased a 42-acre parcel of real estate, which they subdivided into nine lots that they intended to develop into a housing development. *Kleczek*, 328 Ill. App. 3d at 1015-16. The defendants constructed the first house in the development, which they intended to make their primary residence. *Kleczek*, 328 Ill. App. 3d at 1016. Instead, when visiting the subdivision, the plaintiffs asked if the house was for sale, and the defendants indicated that it was and provided the plaintiffs with a " 'spec sheet.' " *Kleczek*, 328 Ill. App. 3d at 1016. The plaintiffs purchased the house, which they later discovered contained defects. *Kleczek*, 328 Ill. App. 3d at 1016-17. The plaintiffs filed a complaint against the defendants, alleging, in relevant part, a violation of the Consumer Fraud Act. After a bench trial, the defendants were found liable, and the defendants appealed. *Kleczek*, 328 Ill. App. 3d at 1017-18.

---

[4]We note that the *Strauss* court reached this conclusion by interpreting a different section of the Consumer Fraud Act as setting forth an exception for such a seller. See *Strauss*, 259 Ill. App. 3d at 609-10. However, that section concerns statements made by a real estate salesman or broker that were provided to the broker by the seller, not statements made by the seller himself. 815 ILCS 505/10b(4) (West 1992). Accordingly, at least one court has expressed disagreement with the *Strauss* court's interpretation of the statute. See *Kleczek v. Jorgensen*, 328 Ill. App. 3d 1012, 1019 (2002).

¶ 117    On appeal, the defendants claimed that the Consumer Fraud Act did not apply, citing the *Zimmerman* line of cases and claiming that they had built the house with the intention of living in it. The court did not find this argument persuasive, holding:

> "Defendants maintain that they built Deer Run No. 2 with the intention of living in it. The trial court did not have to believe them. [The defendant] was in the business of building and selling houses, and he was developing the subdivision in the course of that business. Defendants either held or intended to hold an open house at Deer Run No. 2 in March 1996 and had written a 'spec sheet' for prospective buyers. When [the plaintiff] asked whether defendants' alleged personal residence was for sale, it was instantly available. The trial court could reasonably have found that this was a commercial sale rather than a private sale and that *Zimmerman* and its progeny were distinguishable." *Kleczek*, 328 Ill. App. 3d at 1020.

¶ 118    In the case at bar, defendant claims that the conduct in which she engaged places her in the *Zimmerman* line of cases. By contrast, plaintiffs, and the trial court, find the situation closer to that present in *Kleczek*. We agree with the trial court that an individual who regularly purchases homes for renovation and sells those homes may be subject to the Consumer Fraud Act. Every case in the *Zimmerman* line of cases involves a situation in which the seller sells his or her own residence to another individual. We agree with the *Zimmerman* court that such a sale would not be considered to be engaging in "trade or commerce" as required under the Consumer Fraud Act.[5] However, the sale at issue in the

---

[5]We note that defendant argues that *Zimmerman* should not be interpreted to require the seller to have resided in the property and instead should be read to "exempt[ ] all individual-to-individual sales of single-family homes from the Consumer Fraud Act." We have no need to determine whether *Zimmerman* should be interpreted to apply only to owner-occupied residences or whether it can apply to another situation in which the sale may be considered a "private" sale because, in the case at bar,

case at bar was not such a sale. Here, defendant had purchased several properties both before and after the sale of the subject property and had sold those properties for a profit; defendant did not reside in any of those properties. In other words, defendant did not purchase the subject property for herself and then later decide to sell it—she purchased it specifically to renovate and resell. This is a commercial purpose, not a private purpose. See *Kleczek*, 328 Ill. App. 3d at 1020. Indeed, the trial court specifically found:

> "Defendant was in the business of buying, renovating, and selling residential real estate. She purchased the Property for this purpose. She never lived in the Property or intended to do so. Defendant was not, and never claimed to be, a private seller, selling her own residence."

We cannot find that this factual determination was against the manifest weight of the evidence. Consequently, where defendant was in the business of purchasing, renovating, and selling properties, her conduct falls within the purview of the Consumer Fraud Act.

¶ 119    Defendant also argues that the trial court's determination that she violated the Consumer Fraud Act was against the manifest weight of the evidence. As noted, "[t]o succeed in a private cause of action under the Consumer Fraud Act, a plaintiff must prove '(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception.' " *Avery*, 216 Ill. 2d at 190-91 (quoting *Oliveira*, 201 Ill. 2d at 149). In the case at bar, defendant merely reiterates the same arguments made in the context of the common-law

---

there is no question that defendant's purchase, renovation, and sale of the subject property was part of a pattern of property sales.

fraud claim. Our rationale as set forth in that context applies with equal force here, and we affirm the trial court's judgment on the Consumer Fraud Act claim.

¶ 120    Finally, defendant challenges the trial court's award of attorney fees and costs. The Consumer Fraud Act provides that a trial court may award reasonable attorney fees and costs to the prevailing party. 815 ILCS 505/10a(c) (West 2016). In the case at bar, defendant's sole argument concerning the award of attorney fees and costs is based on her claim that the Consumer Fraud Act does not apply; defendant makes no challenge to the reasonableness of the award itself. Since we have determined that the Consumer Fraud Act is applicable and that the trial court properly found defendant liable for violating it, we affirm the trial court's grant of attorney fees and costs.

¶ 121                                CONCLUSION

¶ 122    For the reasons set forth above, we find that (1) the trial court did not abuse its discretion in admitting the testimony of Larkin, (2) the trial court's finding that defendant was liable for common-law fraud was not against the manifest weight of the evidence, and (3) the trial court properly found that the Consumer Fraud Act is applicable, and its finding that defendant violated it was not against the manifest weight of the evidence.

¶ 123    Affirmed.

**No. 1-18-2447**

| | |
|---|---|
| **Cite as:** | *Pack v. Maslikiewicz*, 2019 IL App (1st) 182447 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-L-1501; the Hon. Jerry A. Esrig, Judge, presiding. |
| **Attorneys for Appellant:** | Pericles Abbasi, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Robert A. Shipley, of Shipley Law Group, Ltd., of Chicago, for appellees. |